436 A.2d 139

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

**v.**

**George E. EWING, Respondent.**

Supreme Court of Pennsylvania.

Argued Sept. 14, 1981.

Decided Oct. 28, 1981.

36

Allen B. Zerfoss, Chief Disciplinary Counsel, Edward A. Burkardt, Asst. Disciplinary Counsel, Pittsburgh, for petitioner.

George E. Ewing, I. P. P., pro se.

Robert F. Frazier, Pittsburgh, for respondent.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION OF THE COURT

WILKINSON, Justice.

This disciplinary proceeding stems from a report of the Disciplinary Board of the Supreme Court of Pennsylvania recommending that respondent be disbarred from the practice of law in this Commonwealth for multiple violations of Disciplinary Rule 1–102(A)(4) which prohibits an attorney from engaging "in conduct involving fraud, deceit, or misrepresentation."

On February 17, 1978, a Petition for Discipline was filed against respondent by the Office of Disciplinary Counsel in response to two separate charges of misconduct levied by former business associates of respondent. Hearing Committee 4.12 was empaneled and after a hearing which produced over 800 pages of testimony, found respondent in violation of DR 1–102(A)(4) as to both charges and recommended disbarment. Respondent excepted to the report and recommendation of the Hearing Committee and a three member

panel of the Disciplinary Board heard oral argument on May 1, 1980. On November 20, 1980 the Board filed its report which concurred with the findings of the Hearing Committee and recommended disbarment. On January 30, 1981, we entered an order suspending respondent and issued a Rule on respondent to show cause why he should not be disbarred. Oral argument was heard by this Court on September 14, 1981. After a thorough review of the record and careful consideration of the arguments raised in respondent's brief, we agree with the recommendation of the Board that disbarment is the appropriate sanction in this matter.

Since two separate charges of misconduct were brought against respondent, we will discuss the relevant facts of each charge separately.

## Charge I—Johnson Matter

In March of 1977, respondent discussed with C. Bayard Johnson, Jr. (Johnson) the possibility of Johnson investing in a business venture which respondent was helping develop for a group of individuals. The venture concerned a patented invention known as an "energy enricher" for which respondent was trying to obtain investment capital for development of the device and possible formation of a corporation. Respondent told Johnson that he would be paid $200 a week for promoting investment in the invention provided he agreed to put $10,000 down in escrow to show he had the means to invest when the new company was formed. Finally, on March 21, 1977, Johnson transferred $10,000 to respondent's escrow account at the Pittsburgh National Bank pursuant to a letter agreement executed by both parties on the same day. The agreement, in addition to alleging that respondent was counsel for undisclosed parties with rights to an "energy enricher" invention, stated that Johnson was transferring the money to respondent's 5% interest bearing escrow account with the option to either invest the money at a later date or have the money returned upon written notice no sooner than sixty days from the date of transfer, March 21, 1977. The agreement also contained language prohibit-

ing Johnson from disclosing any information about the invention to any persons other than those designated by respondent. Within three months after transferring the money to respondent, Johnson came to the conclusion that he had made a foolish investment and decided to reclaim the money. On June 24, 1977, Johnson orally requested the return of the funds only to be informed by respondent that the money had just rolled over into another Certificate of Deposit (C.D.) and would not be available for thirty more days.[1]

Thereafter, on approximately July 25, 1977, Johnson made a second oral request and was told by respondent that he would have to check and see where the funds were. On August 18, 1977, Johnson made a written request for the money as required by the aforementioned agreement, but received no response from respondent. On August 31, 1977, respondent told Johnson in a telephone conversation that the funds would be returned with interest by September 8, 1977. This promise was confirmed in a certified letter, return receipt requested, sent by Johnson to respondent on September 1, 1977. Johnson agreed not to file a complaint with the Disciplinary Board if the money was returned as promised by September 8. The funds were not returned on September 8; rather, Johnson was requested to appear at respondent's office on September 9 and sign an affidavit reaffirm-

1. A careful review of the documents obtained by subpoena duces tecum from the Pittsburgh National Bank reveals that: (1) Johnson's $10,000 was originally deposited in respondent's special escrow checking account on approximately March 21, 1977; (2) respondent indiscriminately invaded the corpus of said account for his own personal use within the next week; (3) on March 30, 1977 respondent purchased C.D. No. 800 ($10,000) with the remaining portion of Johnson's funds and the proceeds of a $5,000 personal loan obtained the same day; (4) C.D. No. 800 was thereafter rolled over every thirty days into a new C.D. (Nos. 803, 806, 813, 823, and 832 respectively); (5) the whole series of C.D.'s was held by the bank as collateral for respondent's continuing string of personal loans; (6) each of the C.D.'s was drawn in the name of "George E. Ewing, Special Escrow Account," with no mention of Johnson's interest therein; and (7) the proceeds of the last C.D. (No. 832), plus interest of $41.09, were deposited in respondent's special escrow checking account on approximately September 30, 1977.

ing that there had been no breach of the non-disclosure portion of the original agreement. Johnson signed the affidavit on September 9 and was given a check post-dated to September 15, 1977. Johnson attempted to cash the check on September 16, 1977, but was told the check could not be honored because the account was overdrawn. When he confronted the respondent, Johnson was told that payment had been stopped on the check because of rumors that he had breached the non-disclosure clause.[2] Ultimately, on October 14, 1977, $10,250 was paid by respondent to Johnson in the form of a cashier's check dated September 30, 1977.

### Charge II—Keleco Matter

Respondent had been authorized by Dictor Capital Corporation (Dictor), a loan brokerage firm in Philadelphia, to advertise in the Pittsburgh area for potential business situations which needed financing. In May, 1977, respondent was contacted by James J. Kelly, a representative of a newly formed corporation, Keleco Enterprises, Inc. (Keleco).[3] Keleco required start-up capital and was interested in having Dictor handle the necessary financing. On May 19, 1977, Kelly signed a letter of intent supplied by respondent whereby Keleco sought to borrow $20,000 from Dictor. A printed heading on the top of the letter read as follows: "Lender Designated by George E. Ewing, Attorney for Dictor Capital Corporation." In addition to the execution of the letter of intent, respondent required a fee of $1,000 before he would arrange the financing with Dictor. Kelly paid the fee within the next week under the assumption that respondent was acting on behalf of Dictor and that Dictor required the fee as a condition precedent to financing. When close to a month had passed without receipt of the $20,000, Kelly

2. Respondent did not specify how Johnson breached the non-disclosure clause or the source of the alleged rumors. Furthermore, there is no evidence of record in support of respondent's claim that the clause was breached.

3. Kelly responded to an advertisement in the May 15, 1977 edition of the Pittsburgh Press which offered financing by Dictor and listed the Pittsburgh telephone number of respondent.

informed respondent by mailgram dated June 20, 1977 that he intended to search elsewhere for financing and requested return of the $1,000. Rather than return the money, respondent convinced Kelly that the financing would be provided shortly and that it would help if some local people could be persuaded to invest in Keleco. Thereafter, a Dr. Hennon from Pittsburgh signed a subscription agreement prepared by respondent for $8,000 worth of "10% convertible nine-month judgment notes," each convertible into Keleco common stock. Dr. Hennon actually paid $4,000 to respondent by way of two $2,000 checks dated July 22, 1977 and August 8, 1977 respectively. However, instead of depositing the funds into the Keleco checking account, respondent deposited the funds into his own escrow account. Shortly thereafter, several checks drawn by Kelly on the Keleco account were dishonored because of insufficient funds. In early September, 1977, Kelly sent Dictor a copy of the letter of intent only to learn that Dictor was not aware of any relationship between itself and Keleco, had never received any fees from Keleco, had never anticipated financing Keleco, and that respondent was not authorized to solicit a "front fee" as a condition to financing by Dictor.[4] Further, when Kelly requested that control of the check book and financial

---

4. Raymond H. Finberg, president of Dictor, testified on direct examination before Hearing Committee 4.12 as follows:

Q. Had Mr. Ewing as of September or October, 1977, had Mr. Ewing brought to your attention as Dictor, any knowledge of any transaction concerning a James J. Kelly or Keleco Enterprises and Dictor?
A. No, sir.
Q. Did Dictor ever participate in any financing in regard to Keleco Company?
A. No, sir.
Q. Did Dictor ever charge or receive any fees from Keleco Company or Kelly in regard to such financing?
A. No, sir.
Q. Was Mr. Ewing ever authorized to accept such monies on behalf of Dictor as are reflected by the receipts executed that you have seen?
A. No, sir.
Q. And Dictor never got the money?
A. No, sir.
MR. BURKARDT: No further questions.

records of Keleco be turned over to him, respondent refused and demanded that Keleco stock be issued to him in compliance with an alleged subscription agreement of which Kelly had no knowledge. Finally, as of the date of the proceedings before Hearing Committee 4.12, Keleco was in receivership and the bulk of the funds expended by Kelly and Dr. Hennon were not accounted for.

The Disciplinary Board found that respondent's conduct with respect to both matters involved commingling of funds entrusted to him with personal funds, indiscriminate personal use of said funds, material misrepresentations when the individuals requested that the funds be returned, and fraudulent representations that respondent was arranging financing for the start-up of a newly formed corporation.

■ It is well-established that our scope of review in attorney disciplinary cases is *de novo*; we are not bound by the findings and recommendations made below, but are at liberty to review and assess the evidence presented as we see fit. *Office of Disciplinary Counsel v. Lewis*, 493 Pa. 519, 426 A.2d 1138 (1981). However, determinations of credibility are best made by the factfinders and to that extent we may rely on the findings of the Hearing Committee or Disciplinary Board "as guidelines for judging credibility of witnesses." *Matter of Green*, 470 Pa. 164, 167, 368 A.2d 245, 246 (1977).

■ The standard of proof required to sustain a recommendation of disbarment was ably stated in our opinion in *Berlant Appeal*, 458 Pa. 439, 441, 328 A.2d 471, 473 (1974), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975).

While we recognize the severe impact that such sanctions may have on an individual's career, we are also mindful of our duty to uphold the quality and integrity of the Bar. Accordingly, we shall not require proof beyond a reasonable doubt, but shall retain the standard which this Court has consistently utilized in disciplinary cases through the years: 'that a preponderance of evidence is necessary to

establish an attorney's unprofessional conduct and the proof of such conduct must be *clear* and *satisfactory.'* *Krehel Appeal*, 419 Pa. 86, 89, 213 A.2d 375, 377 (1965) (emphasis in original).

Respondent first contends that several alleged defects in the disciplinary proceedings below violated his rights to due process. Specifically, he maintains (1) that the subpoenas and subpoenas duces tecum issued at the request of Disciplinary Counsel were illegal, (2) that the report of Hearing Committee 4.12 was invalid because it was rendered by a two-person, rather than a three-person hearing committee,[5] (3) that his request for a continuance was improperly denied by the hearing committee, and (4) that there was a lack of impartiality on the part of Hearing Committee 4.12 and the Disciplinary Board.

■ Respondent has set forth no basis for his allegation that the subpoenas were illegal. Rule 213 of the Pennsylvania Rules of Disciplinary Enforcement (Pa.R.D.E.) grants both Disciplinary Counsel and respondent-attorney the right to obtain subpoenas by filing a statement calling for the issuance of the subpoena with the Prothonotary of the Supreme Court. The subpoenas in question here were issued in compliance with Pa.R.D.E. 213 and this Court, by order dated September 13, 1978, granted the Disciplinary Board's petition to enforce the subpoenas. Suffice it to say that we can find no evidence of record to support respondent's claim that the subpoenas constituted an invasion of privacy or violated the attorney-client privilege of persons not involved in the disciplinary proceedings.

■ Similarly, respondent's argument that he was entitled to have a decision rendered by a hearing committee composed of three members is without merit. Pa.R.D.E. 206(a) provides that "the committee shall act only with the concur-

5. Donald Cress Reiley, Jr., former chairman of Hearing Committee 4.12, died approximately six months after the conclusion of the hearing, but before the report and recommendations were rendered. The remaining two members of Hearing Committee 4.12 issued the report and recommendations on March 13, 1980.

rence of a majority of its members and two members shall constitute a quorum . . . ." Accordingly, we agree with the finding of the Disciplinary Board that the report and recommendation issued by the two remaining members of Hearing Committee 4.12 did not deprive respondent of procedural due process.

■ Respondent next contends that he was prejudiced by the hearing committee's refusal to continue the hearing held on December 11, 1978.[6] The alleged prejudice resulted from the absence of respondent's counsel at the hearing due to a commitment in the Court of Common Pleas of Allegheny County on the same date. The Disciplinary Board found this argument unpersuasive for two reasons: First, because the conflict could have been avoided if respondent's counsel had complied with the Disciplinary Board Rules, § 89.7(b)(3)[7] and second, because Hearing Committee 4.12 granted respondent's Motion to Reopen the Hearing on March 7, 1979, pursuant to Disciplinary Board Rules, § 89.251.[8]

Section 89.7(b)(3) provides that:

Upon receipt of notice fixing a hearing date before a hearing committee . . ., counsel for respondent-attorney within 48 hours thereafter shall deliver written notice . . . of the scheduling of such hearing to the clerk, prothonotary, court administrator, . . . or other appropriate administrative officer of the court . . . with which a conflict might reasonably arise. . . .

The record shows that although respondent and his counsel each received notice of the December 11, 1978 hearing by certified mail on September 29, 1978, neither contacted the Court of Common Pleas of Allegheny County as required by the above rule to avoid a possible conflict. Thus, the hear-

6. We note that after taking testimony for three days in September, 1978, Hearing Committee 4.12, at the request of respondent's counsel, continued the hearing and thereafter duly notified the parties that the hearing would resume on December 11, 1978.

7. 204 Pa.Code § 89.7(b)(3).

8. 204 Pa.Code § 89.251.

ing committee was unaware of the conflict until respondent appeared on December 11, 1978, and orally requested a continuance. Under the circumstances, the continuance was properly denied. Moreover, any possible prejudice was cured when the hearing committee granted respondent's motion to reopen the record and present evidence on March 7, 1979. Since respondent never availed himself of the opportunity to reopen the hearing, he may not now assert that he was prejudiced by the denial of the continuance.

Finally, with respect to respondent's last objection to the proceedings below, we can find no evidence of bias or other impropriety on the part of the hearing committee or the Disciplinary Board.

■ Respondent next argues that the charges of violation of DR 1–102(A)(4) have not been proven by a preponderance of the evidence.

To the contrary, the massive record evidences a conscious pattern of deceit and misrepresentation by respondent throughout his dealings with both Johnson and Kelly. The record is devoid of any justification or rational explanation for respondent's conduct.

Respondent's last argument is that there is no basis for discipline because he was not acting in an attorney-client relationship with Johnson or Kelly at the time of the misconduct. This argument is also without merit.

An attorney is subject to discipline for violation of the Disciplinary Rules, "whether or not the act or omission occurred in the course of an attorney-client relationship." Pa.R.D.E. 203(a). "[W]e cannot distinguish between dishonesty involving client matters and dishonesty in private matters: the seriousness of respondent's misconduct is not lessened by the fact that the victims of his fraud were not his clients." *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 200, 425 A.2d 730, 733 (1981); *see Montgomery County Bar Association v. Hecht*, 456 Pa. 13, 317 A.2d 597 (1974).

We thus conclude that respondent's conduct amounted to multiple, flagrant violations of DR 1–102(A)(4) and that

disbarment is the appropriate sanction. Accordingly, we accept the recommendation of the Disciplinary Board, the Rule is made absolute, George E. Ewing is disbarred from the practice of law within the Commonwealth of Pennsylvania and he shall comply with Pa.R.D.E. 217.