535 A.2d 69

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**George J. KANUCK, Jr., Respondent.**

Supreme Court of Pennsylvania.

Argued Nov. 10, 1987.

Decided Dec. 24, 1987.

George J. Kanuck, Jr., Allentown, for respondent.

Alan J. Davis, Philadelphia, for disciplinary counsel.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

**OPINION OF THE COURT**

PAPADAKOS, Justice.

This disciplinary proceeding stems from a report of the Disciplinary Board of the Supreme Court of Pennsylvania [1]

---

**1.** One board member dissented, recommending disbarment, and three members did not participate in the adjudication.

recommending that Respondent, George J. Kanuck, Jr., be suspended from the practice of law in this Commonwealth for a period of five (5) years. The Board found, *inter alia,* that Respondent had violated Disciplinary Rule 1–102(A)(3) (illegal conduct involving moral turpitude), Rule 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), Rule 1–102(A)(5) (conduct prejudicial to the administration of justice), and Rule 1–102(A)(6) (conduct that adversely reflects on fitness to practice law). After hearing testimony in this matter, the Hearing Committee recommended imposition of the sanction of disbarment. The Board, after review of the entire matter, concluded that the sanction of disbarment was too severe and recommended a five (5) year suspension with costs of the investigation and prosecution to be paid by Respondent. Having heard oral argument, and after a full review of the record submitted by the Board and briefs of the Office of Disciplinary Counsel and Respondent, we conclude that the appropriate sanction to be imposed in this case is a five-year suspension and, therefore, accept the recommendation of the Board.

The record reveals that on May 16, 1986, a Petition for Discipline was filed against Respondent by the Office of Disciplinary Counsel. That petition set out five charges detailing conduct constituting violations of several Disciplinary Rules of the Code of Professional Responsibility. Respondent subsequently filed an answer in which he denied "each and every allegation contained in the petition." Hearings were held before Hearing Committee 2.06 on September 25 and 26, 1986. On January 16, 1987, the Committee found that Respondent had violated DR1–102(A)(3), (4), (5), (6); 6–101(A)(3); 7–101(A)(1), (2), (3); 9–102(A) and 9–102(B)(2), (3), (4),[2] and recommended that Respondent be disbarred. Respondent filed exceptions to the report of the Committee and a three-member panel of

**2.** The disciplinary violations charged are:
**DR 1–102. Misconduct**
(A) A lawyer shall not:

the Board heard oral argument on the exceptions. On April 22, 1987, the Board submitted its report and recommenda-

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

**DR 6–101. Failing to Act Competently**

(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him.

**DR 7–101. Representing a Client Zealously**

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B).

**DR 9–102. Preserving Identity of Funds and Property of a Client.**

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyers or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

tion which made substantially the same findings of fact and identical conclusions of law as did the Committee, but recommended a five (5) year suspension retroactive to the date of Respondent's original suspension, December 6, 1985 (which suspension was the result of a Petition for Emergency Interim Suspension Order previously filed by the Office of Disciplinary Counsel pursuant to Rule 208(f) Pa.R.D.E.).

By Order dated May 29, 1987, this Court issued a Rule on Respondent to show cause why he should not be disbarred. See Rule 208(e)(3) Pa.R.D.E. Pursuant to Rule 208(e)(2) Pa.R.D.E., we granted Respondent's request for oral argument. On November 10, 1987, we heard argument and the matter is now ripe for decision. The facts are not in dispute. Having reviewed the record *de novo*, we find no basis for disturbing the Board's findings as set forth in the report, and, therefore, substantially adopt them in the discussion that follows. The relevant facts of each of the charges made in the Office of Disciplinary Counsel's petition will be set forth separately, followed by Respondent's explanation in mitigation. Respondent admits his misconduct, with regard to commingling of funds, but denies that he converted any funds. He also argues that the Committee erred in failing to consider his testimony in mitigation of the charged violations, and in their recommendation of disbarment.

Charge I relates to Respondent's representation of Mr. and Mrs. Robert Zuercher in a real estate closing on January 11, 1985, at which time they gave Respondent a check in the amount of $12,451.86. The portion due the sellers, Mr. and Mrs. James Hoffman, was $11,631.86. Respondent advised the Hoffmans that he would hold the money in an escrow account pending resolution of certain title matters. However, without their knowledge or consent, the funds were deposited in Respondent's personal account in the American Bank and were used to purchase a money order in the amount of $6,250.00 payable to Prudential Insurance Company. This money order was paid to Prudential to satisfy an obligation of another client, Raymond Kohler, as

will be discussed in Charge II. In addition, $5,000.00 of the Hoffman funds were used in settlement of a malpractice claim asserted against Respondent by Daniel Koehler, which matter is discussed in Charge III. After several complaints by Mrs. Hoffman, Respondent made restitution by delivering a check in the amount of $9,631.86 on March 23, 1985, and a check for $2,000.00 on April 25, 1985, to the Hoffmans. Respondent attempted to justify the delay in payment by explaining that the title search presented problems with regard to defects in the chain of title which had to be resolved, and he anticipated the possibility of undetermined costs. Respondent pointed out that the delay in paying over the funds was only sixty or ninety days, which he did not consider unreasonable under the circumstances. The actual delay in paying over the entire amount due the Hoffmans was 104 days. Respondent presented no testimony concerning the fact that the funds were deposited into his personal account and were converted by Respondent to pay obligations owed to, or on behalf of, other clients.

Charge II relates to Respondent's representation of Raymond Kohler, a disabled employee of Connolly Cement Company, who received disability payments from Prudential Insurance Company in the amount of $17,441.00. Respondent was retained by Mr. Kohler to pursue a claim for disability payments against the Social Security Administration. Respondent was successful in obtaining an award on behalf of Mr. Kohler, who then was required to reimburse Prudential under its subrogation rights, for the disability payments Prudential had made to Mr. Kohler. On June 12, 1983, a check in the amount of $5,000.00 was delivered to Respondent by Mrs. Kohler which was to be remitted to Prudential as partial payment of the aforementioned debt. This check was deposited by Respondent into a personal checking account in Merchants National Bank on June 13, 1983. Respondent drew checks on this account between June 13 and June 27, 1983, reducing the balance to $89.55. None of the checks issued was payable to Prudential, nor was Respondent authorized to use the funds for any other

purpose. Mrs. Kohler subsequently gave Respondent a second check for $8,000.00 dated February 3, 1984, which he deposited along with other unrelated funds into his escrow account in Merchants Bank. This amount was also to be remitted to Prudential. Respondent drew checks against this account reducing the balance as of March 16, 1984 to $1,042.92. None of these checks was issued to Prudential. One of the checks, in the amount of $6,644.85, was made payable to First State Bank with the notation "For Edward L. Smith, et ux payoff." This payment became necessary because Respondent had dissipated funds he received at a settlement on January 13, 1984, part of which were to pay off a mortgage held by First Bank. This will be discussed in Charge IV.

On December 24, 1984, approximately one and one-half (1½) years after he received the initial check from Mrs. Kohler, Respondent withdrew $4,000.00 from his personal account in American Bank and purchased a money order payable to Prudential. On January 18, 1985, he purchased another money order in the amount of $6,250.00 payable to Prudential. This was approximately one year after Respondent had received the second check from Mrs. Kohler. The funds used for this money order belonged to Mr. and Mrs. Hoffman, which Respondent obtained at the settlement on January 11, 1985. In mitigation, Respondent testified that the delay in payment was due to a dispute as to the amount to which Prudential was entitled and that he was entitled to an attorney's fee from Prudential in the amount of $2,750.00 out of the funds involved. Respondent presented no testimony regarding the conversion of the balance of the funds.

Charge III alleges that in January, 1978, Daniel Koehler engaged Respondent regarding the purchase of a mobile home. A check for $548.00 dated August 10, 1978, was delivered to Respondent by Mr. Koehler. This amount constituted sales tax of approximately $500.00 and the

balance was Respondent's fee. This check was deposited by Respondent in an escrow account in First National Bank on September 11, 1978. By November 26, 1978, the balance in the account was reduced to $168.09. None of the checks drawn on this account was issued in connection with the services to be rendered to Mr. Koehler. Respondent also neglected to obtain a certificate of title for the mobile home in Mr. Koehler's name.

Approximately six (6) years later, in 1984, Mr. Koehler decided to sell the mobile home to Elesta McInturff. He again retained Respondent as his attorney. On June 16, 1984, a sales agreement was executed wherein Koehler agreed to sell the trailer for $7,500.00. McInturff agreed to pay $500.00 as a down payment and the balance to be "... paid to Atty. George J. Kanuck, in trust until receipt of title properly executed and filed with the Commonwealth of Pennsylvania." McInturff also delivered to Respondent on June 16, 1984, a check in the amount of $7,450.00 with the notation "taxes 450 trailer 7000." This was deposited by Respondent into his escrow account in Merchants Bank. The purchase money was to be used to satisfy an outstanding mortgage on the trailer, to pay off back taxes, unpaid lot rent, and other miscellaneous expenses. Approximately $500.00 was to be paid to Respondent as his fee. By August 31, 1984, the account balance was reduced to $89.03. Only $969.32 of these funds was used to pay for repairs and lot rent. No payment was made on the mortgage and Mr. Koehler continued to receive demands for payment from the mortgagee. He made several unsuccessful attempts to contact Respondent. He also called Harrisburg and learned that the title was still in the name of the party who sold the trailer to him.

In October, 1984, Mr. Koehler retained new counsel, Stuart Shmookler, Esquire, to complete the sale and to arrange for proper disbursement of the funds involved. In response to Mr. Shmookler's correspondence, Respondent accounted for $5,722.42 of the funds on December 20, 1984, approximately six months after the funds were entrusted to

him. This amount included three mortgage payments made in September, October and November of 1984, leaving a balance of $975.00 due on the mortgage, which was paid on December 24, 1984. Mr. Shmookler pressed a malpractice claim for damages caused to Mr. Koehler by Respondent's negligent handling of the case. This claim was settled for $10,000.00, paid by two checks for $5,000.00 each drawn on Respondent's personal account in American Bank dated March 18, 1985.

As previously discussed under Charge I, Respondent was entrusted with the sum of $11,631.86 to be paid to Mr. and Mrs. Hoffman. These funds were deposited in Respondent's personal account. Respondent withdrew $5,000.00 of these funds on March 11, 1985, deposited same in another personal account, and drew a check for $5,000.00 payable to Stuart Shmookler, Esquire.

Respondent attempted to explain his failure to obtain the certificate of title by stating that about the time of the sale he was involved in relocating his office and he lost the title and forgot about it. Respondent testified that when Mr. Koehler contacted him in 1984 with regard to the sale of the trailer, Respondent advised him that he would have to obtain a duplicate title and have it resigned by the original sellers, because Respondent had lost the original title. However, Respondent could not locate the Niebaums (sic) (the record of title shows the name as Charles W. and Bonnie L. Kneebone). Subsequently, Respondent found the title signed by the Niebaums (sic). He testified that at the time of the hearing in this disciplinary matter, the title certificate was still in his possession as his attorney advised him to hold on to it, but he was then prepared to file it (N.T. 117–118). While the record is silent as to the fate of the $500.00 which was paid to Respondent in January, 1978, as sales tax on the transfer, it appears obvious that since the transfer never took place, the money was never paid by Respondent. There was no explanation made by Respondent concerning his use of these funds which he had in his possession for approximately six years.

Charge IV relates to Respondent's representation of Marlyn Nagy, his cousin, in the purchase of real estate which took place on January 13, 1984. The settlement statement showed an outstanding mortgage with First State Bank in the amount of $6,576.20. Nagy gave two checks to Respondent; one in the amount of $2,190.12 marked "settlement fee," the other a purchase money mortgage check in the amount of $40,000.00 made payable to "George Kanuck, Attorney for Marlyn B. Nagy." Respondent deposited both checks in his escrow account on January 13, 1984. Respondent drew a number of checks against this account so that by January 27, 1984, the outstanding balance was reduced to $437.28. One of these checks was drawn in the amount of $33,200.42 made payable to the Smiths. However, none of the checks was issued in payment of the First State Bank mortgage. Respondent then utilized the funds of another client to satisfy this obligation. Under Charge II, testimony was presented concerning a payment on February 3, 1984, for $8,000.00 to Respondent by Mrs. Kohler for payment to Prudential. Instead, Respondent used the Kohler funds by issuing a check in the amount of $6,644.95 to First State Bank marking the check "Edward L. Smith et ux payoff." The delay in payment of the mortgage was approximately one month.

Finally, Charge V alleges that on December 4, 1984, Frederick J. Parks, President of Triton Enterprises, Inc., entered into an agreement for the purchase of a liquor license from Mr. and Mrs. Gerald J. Green, who were represented by Respondent. The agreement called for a deposit of $1,800.00 to be paid by the buyer and to be held in escrow by Respondent until settlement. Paragraph 7 of the agreement provided, ". . . If the license transfer is not approved by the Pennsylvania Liquor Control Board, Sellers shall refund the entire license fee to Buyer." William Makames, Esquire, Attorney for Mr. Parks, forwarded a check for $1,800.00 payable to Respondent which he marked "escrow liquor license R–15897." This check was deposited on December 13, 1984, by Respondent into a non-escrow account held jointly by George J. Kanuck or Julia A. Ka-

nuck. Settlement was held on February 2, 1984. However, by January 27, 1984, Respondent had issued seventeen (17) checks against the above joint account, reducing the balance to $437.28.

Respondent's testimony concerning the use of these funds was that the $1,800.00 constituted fees for various legal matters which he had handled for Mr. Green, and that Mr. Green agreed to allow him to have this payment as his fee. Mr. Green did not testify.

The Disciplinary Board found that Respondent's conduct with respect to these matters involved a general pattern between 1978 to 1985 of repeated commingling of funds, conversion of client funds to Respondent's own use, using one client's funds to pay off another client's obligation, and with respect to Charge III, failure to render the legal services required thereby damaging the client. The Board noted that these were not isolated incidents, but constituted multiple flagrant violations of Rules of Disciplinary Procedure concerning accountability of funds and proper management of client funds. The Board disagreed with the Committee's finding of no mitigating circumstances and its recommendation of disbarment reasoning that there was only one complaint filed by the alleged "victims" which was subsequently withdrawn. Further, restitution was made by Respondent in all cases. Therefore, the Board determined that the proper sanction for the violations [3] involved should be a five year suspension from the practice of law retroactive to the original date of suspension, December 6, 1985.

Initially, we note that our review in attorney discipline cases is *de novo*. Thus, we are not bound by the findings of the Hearing Committee or the Disciplinary Board, except as guidelines for judging the credibility of witnesses. *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 275, 472 A.2d 186, 188 (1983). "Our task in cases such as this is to protect the public and to preserve public confidence in the legal profession and the judicial system. (Citations

**3.** The Board found violations of the same Disciplinary Rules as the Committee, see Fn. 2.

omitted.) In accomplishing this task we must balance a concern for public welfare with a respect for the substantial interest that an attorney has in continuing his professional involvement in the practice of law...." *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 527, 426 A.2d 1138, 1142 (1981).

Respondent's violations of the Disciplinary Rules constitute serious misconduct which makes him subject to the imposition of discipline. Pa.R.D.E. 203(a). The only question this Court must now decide is whether, on the facts presented here, we should order Respondent's disbarment or impose a lesser form of discipline. Disciplinary sanctions "are not primarily designed for their punitive effects, but for their positive effect of protecting the public and the integrity of the courts from unfit lawyers." *In re Berlant,* 458 Pa. 439, 441, 328 A.2d 471, 473 (1974). In our decision of *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982), we explained the balance that must be accomplished in determining the proper sanction to be imposed:

> The power of the court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional relations, and if he becomes unworthy, it is its duty to withdraw its endorsement. *Davies' Case,* 93 Pa. 116.

*Id.,* 497 Pa. at 402, 441 A.2d at 1201.

In response to the charges, Respondent presented evidence of mitigating circumstances summarized as follows: Respondent testified that at all times relevant to the five charges, he had more than sufficient funds to cover the amounts which were to be escrowed. However, the funds were located in accounts other than his escrow account. Respondent stressed the fact that before he became aware of any complaint filed against him, all clients had been fully reimbursed. While Respondent acknowledged that he oper-

ated what little law practice there was in a very casual and unprofessional manner, and admitted that it was wrong to fail to maintain proper escrow accounts in the subject transactions, he denied that he used his clients' funds for his personal benefit. Despite the fact that escrow funds became commingled among his other accounts, Respondent maintains that at all times the funds of his clients were protected.

Also, in mitigation, Respondent explained that he had essentially given up the practice of law except for the friends and relatives involved in the charges in the instant matter. Respondent testified that starting in 1978 he ran for the Office of State Representative. He took office in 1979 and began to wind down his law practice. Gradually he took on less work and by 1981 he terminated his secretary, sold his law office and interest in a three-way partnership, moved his office to his home, and performed most of his own clerical duties. Respondent stated that by this time the only clients he had left were people who had either worked on his campaign and who wanted favors, or old clients who were friends. Respondent took on no new cases, and the only legal work he performed at this time was in the nature of favors for friends and family for which he charged little or nothing. With regard to unanswered or unreturned telephone calls from clients, Respondent testified that his mother answered the telephone most times and took messages for him. However, he was in Harrisburg three and four days a week and he returned the calls as soon as he could. Respondent stated that at this point the concept of an escrow account began to mean nothing. He started to commingle client funds with funds pertaining to other businesses and his own personal funds, not because he needed the money, but because he no longer had an office in Allentown where the bank in which he had an escrow account was located, and he was often out of town.

In 1982, Respondent resigned from the Legislature to accept a presidential appointment to serve as a U.S. Commissioner on the Delaware River Basin Commission, and

federal work rules precluded his exercising outside employment other than casual duties. Respondent asserts that he gave up the practice of law in 1982 except on a very casual basis serving mostly relatives and friends (N.T. 106–128). Respondent further asserts that it is his intention "not to ever practice law again, especially in Pennsylvania." Respondent contends that while some form of punishment is in order for his commingling of clients' funds, the severity of the discipline must be tempered by the facts presented in this case. Respondent points out that the report and recommendation of the Committee made no mention whatsoever of his testimony at the hearing. Nor was there an investigation into his assertion that sufficient funds were available in bank accounts other than those in which client funds were deposited, to cover the amount of funds entrusted to him. Respondent asserts that shoddy bookkeeping and unethical behavior are two different things, and that the Committee erred as a matter of law in failing to consider his testimony. If this was a matter of credibility, Respondent believes that the report should have so stated. Finally, Respondent contends that since he has had no prior disciplinary problems, since restitution was made in all cases, since all of the parties involved were friends or relatives, since no monies were outstanding *prior* to the start of the disciplinary inquiry, and since, at all times, sufficient funds were available in accounts other than his escrow account to cover funds entrusted to him, these facts should reduce the sanction imposed on him to a suspension for time already served on suspension, from December 6, 1985 to the present. In the alternative, Respondent requests that he be allowed to resign in good standing with the understanding or agreement that he never practice law again. We note that even after the close of testimony, Respondent was provided the opportunity to submit financial documentation to support his repeated averments that he had money in other accounts to cover the amount he should have been holding in escrow. Respondent alleged that he maintained such records at the office of his prior counsel. (N.T. 137–138). The record reflects that no such

documentation has been submitted since the close of testimony on September 26, 1986. The evidence that is on record concerning Respondent's financial condition indicates that a mortgage foreclosure complaint was filed against him in July, 1984. (N.T. 131–132). We note further that had Respondent accepted the Committee's invitation to submit such documentation, it would not have been relevant either as a defense or in mitigation of the violations which were proven by clear and convincing evidence. It is quite obvious that the Committee exercised its discretion as a finder of fact to give no credence to Respondent's claims of wealth.

In making their recommendation, neither the Board, nor the Hearing Committee took into consideration the nature of Respondent's limited practice and the fact that the clients involved here were either friends or relatives of the Respondent. However, we find that these facts are also irrelevant. We recognize the necessity of considering all *relevant* facts to fashion appropriate discipline, and we are mindful of the need for consistency in the results reached in disciplinary cases so that similar misconduct is not punished in radically different ways. We are also concerned that each case, subject as it is to our exclusive jurisdiction and *de novo* review, be decided on the totality of the facts presented. *Lucarini, supra,* 504 Pa. at 280, 472 A.2d at 190. However, these additional facts are not helpful to Respondent. The Code does not impose a lesser standard on an attorney whose practice is small, or who is acting on behalf of friends or relatives. We are not satisfied that these facts sufficiently mitigate the severity of Respondent's misconduct as to justify a form of discipline less than the five-year suspension recommended by the Board.

Disciplinary Counsel also argues that there are no mitigating circumstances and urges disbarment in light of the egregious violations here. In support of this recommendation, Disciplinary Counsel cites *Office of Disciplinary Counsel v. Lucarini, supra; Office of Disciplinary Counsel v. Knepp, supra;* and *Office of Disciplinary Counsel v.*

*Lewis, supra,* as cases involving factual situations similar to the present case, and all three resulted in the disbarment of the respondent attorneys.[4] We have previously declined and again decline to adopt a *per se* rule requiring disbarment of any attorney who commingles or converts clients' funds or improperly shifts funds in escrow accounts, regardless of the other facts present in the case. See, *Lucarini, supra,* 504 Pa. at 280, 472 A.2d at 190. There is no evidence that Respondent intended to embezzle his clients' funds. The record is clear that he apparently "borrowed" the funds and made restitution in every case. Nevertheless, the unauthorized use of client funds is inexcusable even when accompanied by an intent to return them. Having considered all five charges, we accept the recommendation of the Disciplinary Board and the Respondent is herewith suspended from the practice of law in this Commonwealth for a period of five (5) years, effective December 6, 1985. Further, Respondent is ordered to pay the costs of the investigation in this matter.

Accordingly, the Rule to Show Cause why Respondent Should Not be Disbarred is discharged.

LARSEN, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent. I would adopt a *per se* rule of disbarment of any attorney who converts (steals) his client's money. Thus, I would disbar the respondent.

---

**4.** While the *Lucarini, Knepp* and *Lewis* cases are similar to the present case, there are also factual differences which should be noted. All three cases involved the commingling and conversion of clients' funds and the *Knepp* case involved the neglect of legal matters. However, the *Knepp* case also involved the charging of excessive legal fees. The *Lewis* case involved the intentional failure to represent a client properly. The *Lucarini* case also involved forgery. These latter violations are not present here. Further, in *Lewis,* the respondent had received prior private discipline on two unrelated matters. *Knepp* only made restitution after he learned of the disciplinary proceeding, and he lied to the investigator. *Lucarini* continued in unethical behavior after the investigation started, and refused to cooperate with Disciplinary Counsel.