582

Disciplinary Board Docket no. 109 D.B. 91.

SLOANE, *Member,* January 21, 1993—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

On September 26, 1991, the Office of Disciplinary Counsel filed a petition for discipline of respondent based on allegedly improper handling of client funds.

The matter was referred to Hearing Committee [    ], which was chaired by [    ], Esq., and included [    ], Esq., and [    ], Esq. The committee held hearings on the matter on January 7 and 21, 1992. On May 26, 1992, the Hearing Committee filed its report on the matter and recommended that respondent be disbarred.

Respondent filed a brief on exceptions to the Hearing Committee report on June 19, 1992.

On June 24, 1992, petitioner filed a brief in opposition to respondent's exceptions.

Oral argument on the matter was held before a three-member panel of the Disciplinary Board on October 14, 1992.

The matter was adjudicated at the October 23, 1992 meeting of the Disciplinary Board.

## FINDINGS OF FACT

(1) Petitioner, whose principal office is located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, PA 15219, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was admitted to the Pennsylvania bar in 1980. He maintains an office for the practice of law in [    ], [    ] County, Pa.

### Charge I—[A] Matter

(3) In April 1987, one [A] was involved in an automobile accident and thereafter hired respondent for legal representation on a contingency fee basis.

(4) In late March 1990, the respondent settled [A's] accident case for the sum of $8,000 with the insurance carrier, [B].

(5) Respondent provided the carrier with a release purportedly signed by [A] on March 28, 1990.

(6) In fact, the release was not signed by [A] but her signature was fraudulently placed on the release by respondent without his client's knowledge, authorization or consent.

(7) On or about March 29, 1990, the insurance company issued its settlement check in the amount of $8,000 payable to both respondent and to [A].

(8) On respondent's receipt of the insurance carrier's check, he forged [A's] endorsement on the reverse side and cashed the check at the [C] Bank in [    ], Pa.

(9) Upon cashing the check, respondent deposited $5,000 into his own account and on April 10, 1990, used some of his client's funds for his own purposes without her knowledge, consent or permission.

(10) Thereafter, respondent entered into a course of deceit and misrepresentation with regard to the aforesaid settlement proceeds.

(11) On or about May 2, 1990, respondent asked [A] to come into his office to sign a release form to procure a settlement of $8,000.

(12) At no time did respondent inform [A] that he had previously submitted a release with her forged signature to the insurance company nor that he had previously cashed an insurance settlement check of $8,000 with her forged endorsement.

(13) On May 3, 1990, [A] did, in fact, sign a release in respondent's office.

(14) At no time during the meeting of May 3, 1990, did respondent tell her about the previously received release, and that he had signed her name to it, or that the prior release had been submitted to the insurance company and funds received.

(15) Respondent thereafter continued his course of misrepresentation and deceit by telephoning [A] and advising her that the insurance company would not issue its settlement check until after May 30, 1990.

(16) On various occasions thereafter, between May 3, 1990 and August 10, 1990, respondent continued his

deceit and misrepresentation by falsely informing [A] that there was a delay on the part of the insurance company in issuing her insurance settlement check.

(17) On or about August 10, 1990, [A] met with respondent at which time he finally issued a check to her in the amount of $5,333, which check was postdated for August 20, 1990.

(18) In a later conversation, respondent advised [A] to hold off cashing the check until August 21 because he had to transfer funds into his account in order to cover the check.

## Charge II—[D] Matter

(19) The respondent represented Mr. and Mrs. [D], who co-signed a note for their son [E] at the [F] Co. using a mortgage as collateral for the note.

(20) After the son entered into bankruptcy, [F] proceeded against Mr. and Mrs. [D] with a mortgage foreclosure action and respondent represented the [D] in this litigation.

(21) Respondent and counsel for [F] eventually agreed to resolve the foreclosure action for the sum of $2,500.

(22) In order to pay the settlement, the [D] arranged for a $2,500 loan from the [G] Bank of [    ], Pa.

(23) On July 26, 1990, the [D] obtained an "official check" in the aforesaid amount which designated respondent as payee and the [D] as the remitters.

(24) After the aforesaid check was delivered to respondent, he cashed said check on or about July 31, 1990, at the [C] Bank in [    ], Pa., and he did not deposit the proceeds into his escrow account.

(25) Instead, respondent converted and misappropriated the aforesaid sum to his own uses and purposes without the knowledge, consent or permission of the [D].

(26) The balance in respondent's escrow account on September 7, 1990 was $112.58.

(27) On September 12, 1990, respondent deposited the amount of $2,500 into his escrow account which increased the balance to the amount of $2,762.58.

(28) After the aforesaid deposit, respondent issued a check on his escrow account for $2,500, dated September 11, 1990, payable to the law firm of counsel for [F] in resolution of the mortgage foreclosure action.

## *Charge III—[H] Matter*

(29) On or about September 20, 1988, [H] was injured in a slip and fall accident, and she hired respondent to represent her in her claim against [I].

(30) In March 1990, respondent settled [H's] case for $1,000.

(31) As a result of the aforesaid settlement, the [I] Corporation issued its check in the amount of $1,000 dated March 29, 1990, payable both to respondent and to [H].

(32) On April 3, 1990, respondent negotiated the check at the [C] Bank in [  ], Pa., whereupon he retained $250 in cash as his 25 percent contingency fee and deposited the balance of $750 into his escrow account.

(33) Respondent thereafter issued various checks from his escrow account, none of which represented the payment to [H] of her share of the settlement proceeds, and by April 18, 1990, the balance in respondent's escrow account had been reduced to approximately $14, thereby establishing respondent's misappropriation and conversion of [H's] share of the settlement proceeds, without her knowledge, consent or permission.

(34) Respondent, on at least one occasion, incorrectly advised his client that he had not as yet received the settlement check.

(35) [H] telephoned respondent on several occasions to determine when she would be paid her settlement proceeds.

(36) On those occasions, respondent failed to advise [H] of his receipt of an insurance settlement check and his subsequent conversion of [H's] share of the settlement proceeds.

(37) In early September 1990, respondent contacted [H] and continued his misrepresentations by informing her that he still had not yet received the insurance settlement check, but expected to receive it soon. Respondent requested [H] to come to his office on September 14, 1990.

(38) When [H] arrived in respondent's office on September 14, 1990, he provided her with $750 in cash and had her sign a handwritten letter the same date which stated in part, "This letter acknowledges my receipt in cash from a check from [I] Co. to my name and your name in the amount of $1,000."

### Charge IV—[J] Matter

(39) On or about March 27, 1988, [J] was involved in an accident and thereafter hired respondent to represent her with reference to that accident.

(40) Thereafter, in January 1990, respondent settled the [J] accident case for $6,000.

(41) The [K] Insurance Co. issued its settlement check for $6,000 payable to both respondent and [J] which check was dated January 31, 1990.

(42) On or about February 1, 1990, respondent negotiated the aforesaid check at the [C] Bank in [ ], Pa.

(43) Respondent deposited $5,000 of the $6,000 into his escrow account, retaining $1,000 as a legal fee.

(44) Thereafter, respondent issued various checks on his escrow account, none of which represented payment to [J] of her share of the settlement proceeds.

(45) As of March 29, 1990, the balance in respondent's escrow account had been reduced to approximately $10.

(46) On or about March 29, 1990, respondent had settled the accident case of [A].

(47) As a result of that settlement, respondent had deposited $5,000 of the $8,000 [A] settlement funds into his escrow account on March 30, 1990.

(48) Respondent's deposit of $5,000 resulting from the [A] accident case provided him with sufficient funds to pay [J] $5,000 which he accomplished by issuing check no. 836 on March 31, 1990.

## CHARACTER TESTIMONY

(49) [L], Esq., a deputy attorney general, testified that he had known respondent since law school and despite his knowledge of the present proceedings before the board, he would still trust [respondent] to represent his family.

(50) The sheriff of [ ] County, [M], testified that in his official duties he had dealt with respondent and found him honest and professional and [M] testified that he had never heard a derogatory remark regarding respondent's reliability, trustworthiness and honesty.

(51) A second cousin of respondent, [N], a priest, was a recently retired professor of psychology at [ ] University and Father [N] testified that the respondent

was repentant and had a reputation for honesty and as a family man in [    ].

(52) [O], Esq., testified as an attorney and president of the [    ] Bar Association and testified that he had had a working relationship over the past four or five years pursuant to which respondent would refer personal injury cases to him. He opined that he had been referred approximately 10 to 15 cases. Attorney [O] testified that respondent had a reputation for honesty in the community.

(53) [P] was a drug and alcohol treatment supervisor for the State of Pennsylvania at [    ] who had known respondent his entire life and he testified that respondent conducts himself professionally, is very dedicated to his family and is a human being.

(54) [O], [Q], [R] and [S] all testified that respondent's reputation in the community where he lives as being honest, truthful, a good family man for the best and highly respected.

(55) Respondent's wife of 15 years, [T], testified that they had three children, ages 12, 10 and 4.

(56) [T] is employed by [U] Nursing Association working a four-day week as a private duty nurse. She received a check for $464 each week, of which $80 went to the [U] Nursing Association. These amounts were the only income other than her husband's in the household.

Their mortgage payments of $885 per month were delinquent and the house was subject to foreclosure.

Respondent's office is at home. She testified that her husband was a good family man and attended church on Sundays.

(57) [V] of [    ], Pa., was an environmental technician who testified he had known respondent for approximately 16 years. He testified that respondent's reputation for being an honest, good family man was good and excellent.

He testified that respondent had helped raise funds for his sick child.

(58) Respondent testified and corroborated his wife's testimony. A balance sheet prepared by him showing a negative net worth of $5,450 was introduced in evidence. Moreover, respondent argued that the reason why he got into difficulty was that he was counting on funds from a case called "[W]," but that the case never settled as anticipated.

(59) Respondent testified that [A] was paid in full in August 1990, that the [D] money was paid in full to the [F] Co.

(60) Respondent testified that after charges were brought against him criminally in February 1991, he was placed in an ARD program following a preliminary hearing.

(61) Respondent had received a plaque from Legal Services for his work with the BBI Program and still does much pro bono work.

(62) Respondent graduated from [    ] Law School in 1980, having done one year of law school at [    ].

His undergraduate work was done at [    ] College in [    ] where he was a magna cum laude graduate. He went to [    ] High School and [    ] Elementary School.

## CONCLUSIONS OF LAW

Respondent, by virtue of his aforementioned conduct, has violated the following Rules of Professional Conduct:

(63) R.P.C. 1.4(a), which requires a lawyer to keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

(64) R.P.C. 1.4(b), which mandates that a lawyer explain a matter to the extent necessary for the client to make informed decisions in regard to the representation.

(65) R.P.C. 1.15(a), which requires a lawyer to hold a client or third party's property separate from his own.

(66) R.P.C. 1.15(b), which commands a lawyer to promptly notify a client or third party of receipt of funds or property in which that person has an interest, and deliver and account for such property promptly.

(67) R.P.C. 1.15(c), which requires the segregation of property in which both a lawyer and another party claim an interest, until there is an accounting and severance of their interest.

(68) R.P.C. 8.4(a), which prohibits the attempted or actual violation of a Rule of Professional Conduct or inducement or violation of such Rules by another.

(69) R.P.C. 8.4(b), which proscribes commission of a criminal act adversely reflecting upon a lawyer's honesty, trustworthiness, or fitness to practice law.

(70) R.P.C. 8.4(c), which precludes a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

## DISCUSSION

Respondent has engaged in an intentional and deliberate pattern of misappropriating client funds, forgery, and misrepresentation. The documentary and testamentary evidence conclusively demonstrate that respondent repeatedly forged clients' signatures in order to gain access to funds received in the course of professional representation and that he used those monies for his own benefit.

In both the [A] and [H] matters, respondent forged his clients' signatures. He then deposited and used settlement proceeds without the knowledge or consent of his clients. In all four matters outlined in the petition for discipline, respondent mishandled entrusted funds without the knowledge or consent of his clients. The

issue before this board is the appropriate measure of discipline for such egregious professional misconduct.

There is no "per se" rule for discipline in Pennsylvania. See *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). However, the Disciplinary Board and Supreme Court have traditionally regarded the misappropriating of client funds as a serious act of misconduct requiring the strictest disciplinary sanction. As the Supreme Court stated in the *Ewing* case, misappropriation of client funds and misrepresentation concerning such devious conduct on the part of an attorney warrants disbarment. *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981). The mishandling of client monies is a serious breach of public trust which will not be tolerated in this Commonwealth. *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981).

It is the actual abdication of one's fiduciary duty, and the resulting loss of public faith, that provides the foundation for attorney discipline. As the court found in the *Kanuck* case, it is irrelevant that the attorney was in possession of sufficient funds to replace those which had been converted; the salient fact was that the respondent had breached his duty to keep client funds inviolate. *Office of Disciplinary Counsel v. Kanuck,* 517 Pa. 160, 535 A.2d 69 (1987). Just as the ability to replace converted funds is irrelevant, so is the reason for the lapse of ethical behavior. See *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986); *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982).

Respondent has attempted to elicit a lesser disciplinary sanction based on the fact that he did make restitution and was in dire financial straits at the time the misconduct occurred. Although we sympathize with his predicament, we find that his arguments for mitigation lack merit.

Each of the four charges upon which the evidence was presented involved misappropriation of funds, deceit, and in some instances, forgery. The Supreme Court has often stated that a number of incidents, although unrelated, when considered together, can demonstrate such complete disregard for professional standards that disbarment is necessitated. *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 484, 345 A.2d 616, 622 (1975).

Although certain cases were cited by respondent which represent circumstances where disbarment was not imposed, respondent's conduct is closer to the conduct warranting disbarment in *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). In *Keller,* multiple charges of misappropriation were involved, the misappropriation was compounded by forgery, and respondent Keller "used deception to cover his misconduct..." *Id.* at 581, 506 A.2d at 876. Just as the instant respondent advised [A] to wait before depositing the check that he finally provided to her, respondent Keller made a similar request. *Id.* The court made the following statement in *Keller,* which is just as applicable to the instant respondent:

"The real question raised in this case is whether the sanction of disbarment is too harsh under the circumstances presented. If we were here primarily concerned with a punishment of the individual, strong argument could be made in view of the circumstances surrounding the errant behavior. We sympathize with the situation that confronted respondent and concede that if judgment of him alone was the sole consideration extenuating circumstances could be persuasively argued. However, as we previously noted, the focus is not upon the respondent but rather it is directed to the impact of his conduct upon the system and its effect on the perception of that system by the society it serves.

"Here we are confronted with a forgery, the conversion and commingling of entrusted funds, the use of misrepresentation in an effort to avoid detection, and the adverse effect upon the interests of his clients caused by his behavior. These serious breaches of trust cannot be ignored because of the mitigating circumstances offered by respondent in his defense...

"Unfortunately for respondent, the imposition of a period of suspension, even for a period of five years, would be an inadequate response..." *Id.* at 585, 506 A.2d at 877-78.

Another similar case which resulted in disbarment is *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981). As in the instant matter, the *Ewing* case involved "commingling of funds entrusted to him with personal funds, indiscriminate personal use of said funds, material misrepresentations when the individuals requested that the funds be returned..." *Id.* at 42, 436 A.2d at 142. However, we believe that the instant matter is even more egregious in that it involves [respondent's] forgery of a release and insurance settlement checks. See also, *Office of Disciplinary Counsel v. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987) and *In re Anonymous Nos. 47 and 89 D.B. 87 and 15 and 23 D.B. 88,* 12 D.&C.4th 122 (1990).

The respondent in the instant matter has attempted to mitigate his egregious conduct by offering evidence in the nature of both character testimony and his poor financial condition at the time the thefts occurred. *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982), is another case where there were multiple charges of misappropriation and dishonest statements to clients, as well as related misconduct. Respondent attributed his "misconduct to financial difficulties arising from his extensive involvement in politics, coupled with

his desire to maintain an image of solvency." The court answered this argument by simply stating, "This in no way mitigates the seriousness of his misconduct involving clients' funds," adding the fact that respondent had no prior disciplinary record was not a mitigating factor under the circumstances of the case. *Id.* at 403, 441 A.2d at 1201.

In *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981), the court again ordered disbarment in a matter involving misappropriation of client funds and misrepresentations, although it was not compounded by the forgery that is present in the instant matter. In disbarring Lewis, the court gave no weight to respondent's "belated restitution," and, perhaps more importantly, made the following statement:

"What we wish to emphasize in this case is that Mr. Lewis' actions involved a breach of public trust. A client must be able to look to his attorney for sound advice; know that the attorney will pursue the client's interests vigorously and effectively; and rest assured that any financial transactions carried out on the client's behalf will be scrupulously honest, will be fully accounted for at the client's request and will involve full and immediate payment of funds that are due and owing the client. This public trust that an attorney owes his client is in the nature of a fiduciary relationship involving the highest standards of professional conduct. As the U.S. Circuit Court of Appeal for the Seventh District put it: '[T]he real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust.' *In re Echeles,* 430 F.2d 347, 349-50 (7th Cir. 1970), cited with approval in *Office of Disciplinary Counsel v. Campbell,* 463 Pa.

472, 479, 345 A.2d 616, 620 (1975), *cert. den.,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976)."

Respondent also argues that the Hearing Committee should have permitted testimony concerning the "[W] case" which allegedly was a civil proceeding in which the respondent was to receive a large referral fee, according to his brief. Apparently, respondent believes that his anticipation of a referral fee mitigates the misappropriations, forgeries, and material misrepresentations which have taken place in the instant case. This is not the first instance in which a respondent has sought mitigation by pointing to other funds, whether real or anticipated. In *Office of Disciplinary Counsel v. Kanuck,* 517 Pa. 160, 535 A.2d 69, (1987), the respondent had argued that there was "no investigation into his assertion that sufficient funds were available in bank accounts other than those in which client funds were deposited, to cover the amount of funds entrusted to him." The court answered the argument by the following statements:

"We note further that had respondent accepted the committee's invitation to submit such documentation, *it would not have been relevant either as a defense or in mitigation of the violations which were proven by clear and convincing evidence.* It is quite obvious that the committee exercised its discretion as a finder of fact to give no credence to respondent's claim of wealth." *Id.* at 173, 535 A.2d at 76. (emphasis added)

Finally, and most importantly, we do not believe that respondent even comprehends the seriousness of his misconduct. This is important since one of the functions of the disciplinary process is to determine the continued fitness of an attorney to practice law. *Office of Dis-*

*ciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975). Instead of acknowledging his improper conduct, respondent testified that he has now changed his power of attorney in personal injury cases to permit him to sign his clients' names and endorse checks issued to them. Therefore, we are shocked to see that respondent's answer to his disciplinary problems is to attempt to somehow get permission from his clients to make it easier to mishandle their funds.

In disciplinary matters, the primary task of the Supreme Court is to protect the public and maintain the integrity of the legal profession. We are therefore in unanimous agreement that respondent's misappropriation of client funds, some of which he gained access to by forging client signatures and releases, and misrepresentations concerning his possession of entrusted property, warrants disbarment. No sanction short of removal of respondent from the practice of law will ensure that the interests of the public and the integrity of the bar are maintained. See *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987); *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982).

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [     ], be disbarred.

In addition, the board recommends that the court direct that respondent pay all necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Ms. Flaherty did not participate in the adjudication.

## ORDER

May 21, 1993—Upon consideration of the report and recommendations of the Disciplinary Board dated January 21, 1993, and following oral argument, it is hereby ordered that [respondent] be and he is disbarred from the bar of this Commonwealth and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.