## In re Anonymous No. 132 D.B. 88

Disciplinary Board Docket no. 132 D.B. 88.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

TUMOLO, *Member*, January 5, 1990.— Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to this honorable court with regard to the above-captioned petition for discipline.

## PROCEDURAL HISTORY

Respondent is an [ ] County attorney who was admitted to the practice of law in 1956. His only previous disciplinary infraction was an informal admonition in April 1986. That resulted from the slow handling of an estate, but there was no loss of money to any client.

On December 29, 1988, the Office of Disciplinary Counsel filed a two-count petition for discipline. That petition alleged the following rules violations:

(A) Rule 1-102(A)(4) — conduct involving dishonesty, fraud, deceit, or misrepresentation;

(B) Rule 1-102(A)(6) — conduct adversely reflecting an attorney's fitness to practice law;

(C) Rule 6-101(A)(3) — conduct involving neglect of a legal matter entrusted to an attorney;

(D) Rule 7-101(A)(1) — failure to seek the lawful objectives of his client through reasonably available means permitted by law;

(E) Rule 7-101(A)(2) — failure to carry out a contract of employment entered into with a client for professional services;

(F) Rule 9-102(A) — all funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated, and no funds belonging to the lawyer or law firm shall be deposited therein;

(G) R.P.C. 1.3 — a lawyer shall act with reasonable diligence and promptness in representing a client;

(H) R.P.C. 1.15(a) — a lawyer shall hold property of clients or third persons, that is in a lawyer's possession in connection with their representation, separate from the lawyer's own property;

(I) R.P.C. 1.15(b) — upon receiving funds or other property in which a client or third person has an interest, the lawyer shall promptly notify the client or third person. A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(J) R.P.C. 8.4 — it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

Hearing Committee [ ], chaired by [ ], and with members [ ] and [ ] conducted a hearing on May 15, 1989. The parties presented a stipulation of facts which was amplified slightly by the hearing committee in its recommendation to the board. The stipulated facts bind both parties. See Disciplinary Board Rule 89.131.

With regard to charge 1 the hearing committee found violations of rule 1-102(A)(4); rule 1-102(A)(6); rule 9-102(A); rule 1.15(a); rule 1.15(b); and, rule 8.4(c). With regard to charge 2, the hearing

committee found violations of rule 1-102(A)(4); rule 1-102(A)(6); rule 9-102(A); rule 1.15(a); and, rule 8.4(c).

On October 6, 1989, the hearing committee filed its report and recommendation, and with a thorough consideration of the stipulations and dispositional witnesses recommended to the board that respondent be suspended for two years.

On October 18, 1989 the petitioner filed a brief on exceptions. Aside from some grammatical corrections petitioner accepted the findings of fact and conclusions of law made by the hearing committee, but took exception to the hearing committee's recommendation for a two-year suspension, contending that the discipline should be for a minimum of three years in the event the board found that respondent cooperated in the investigation, and a disbarment in the event the board found this mitigation was simply "damage control."

On October 26, 1989, respondent filed a brief on exceptions, requesting that pursuant to section 89.202(a)(2) of the Disciplinary Board Rules that certain *additional* findings of fact which were offered by respondent should have been accepted by the hearing committee. Respondent also contended that he had not violated the "Escrow Rules" i.e., rule 9-102(A) and rule 1.15(a). But the main thrust of respondent's exceptions were that the hearing committee had made inaccurate references in its discussion (not in its findings of fact) to various misrepresentations respondent made to clients, and that this error lead to an overly severe recommendation for discipline.

Oral argument was heard before a panel of the board on December 6, 1989, and the matter was adjudicated before the entire board on December 8, 1989.

## FINDINGS OF FACT

The board finds the facts to be as set forth by the committee, but supplemented in accord with Disciplinary Board Rule 89-202(a)(2) as will be hereinafter set forth:

(1) Respondent, [   ], Esq., was admitted to practice law in the Commonwealth of Pennsylvania in 1956, with his current office located at [   ].'

(2) On or about April 10, 1985, [A] met with respondent concerning respondent representing him in a personal-injury action.

(3) [A] was injured on March 16, 1985, while using a posthole digger on the property of his neighbor, [B]. [A] received medical treatment at the cost of $3,969.40. Respondent agreed to represent [A] for a 40-percent contingency fee.

(4) On or about March 10, 1987, respondent filed a writ of summons on [A's] behalf against [B] and the [C] Company, the manufacturer of the posthole digger used by [A], in the Court of Common Pleas of [   ] County, and on May 13, 1987, he filed a complaint in civil action against both parties.

(5) In early June 1987, respondent negotiated a settlement with defendants' insurance carriers by which [A] was to receive $8,000 from [D] Insurance Company, which insured the [C] Company; and $1,000 from [E] Insurance Company, which insured [B].

(6) Shortly thereafter, [A] met with respondent and signed a settlement agreement, prepared by respondent, in which [A] agreed that:

(a) he accepted $9,000 to settle his claims arising from the March 16, 1985 accident; and,

(b) respondent would receive $3,600 as his attorney's fee.

(c) [A] was to receive $5,400 out of which respondent would pay to [A's] medical providers the following sums:

(i) $2,140 to [F] Surgical Associates;

(ii) $76 to [G] Radiology;

(iii) $222.75 to [G] Hospital;

(iv) $300 to [G] Anesthesia; and,

(v) $1,230.65 to [G] Hospital.

The balance and any savings affected by the creditors reducing the amount owed to them was to be paid to [A].

(7) On or about June 10, 1987, respondent received a check from [D] Insurance Company, dated June 10, 1987, in the amount of $8,000 made payable to [A] and respondent which they then endorsed.

(8) On June 10, 1987, respondent deposited this check into his [H] Bank Account, no. [ ], denominated "[Respondent], Attorney at Law, Client Account." Of the $8,000, respondent was entitled to receive $3,200 as his fee, and he was entrusted to maintain inviolate the balance of $4,800 on [A's] behalf in his client account.

(9) From June 10, 1987 to June 16, 1987, respondent failed to maintain the $4,800 inviolate. On June 10, 1987, the same day he deposited the check, respondent issued two checks in the amount of $2,000 payable to respondent and one check in the amount of $4,233.31 payable to [I]. The checks cleared the client account on June 12/and June 16, respectively, leaving an account balance of $809.07 on June 16, 1987. No other check cleared related to the client [A's] legal matter.

(10) As a result of the foregoing, respondent had thereby misappropriated $3,990.93 of the $4,800 of the client [A's] funds which were entrusted to respondent. As of June 16, 1987, there was a balance of $809.07 in respondent's client fund.

(11) On or about June 18, 1987, respondent received a check from [E] Insurance Company dated June 17, 1987, in the amount of $1,000 made payable to [A] and respondent which was then endorsed by both parties.

(12) On June 18, 1987, respondent deposited the said check into his client account. Of the $1,000, respondent was entitled to a fee of $400 and he was entrusted to maintain inviolate the balance of $600 in his client account.

(13) As a result of the deposited $1,000 check on June 18, 1987, respondent was then entrusted to maintain inviolate $5,400 on the client [A's] behalf.

(14) By letter dated August 14, 1987, respondent sent [A] a check in the amount of $1,130.60 drawn on his client account. According to the letter and the check, the amount represented partial settlement of the funds due [A].

(15) On numerous occasions from June 18 until August 17, 1987, the balance of respondent's client account was substantially less than the $5,400 entrusted to him on behalf of the client [A]. From June 18 until July 1, 1987, the balance was $559.07. From July 14, 1987 until July 23, 1987, the balance was always less than $5,400.

(16) As a result of the check in the amount of $1,130.60 clearing respondent's client account on August 17, 1987, respondent was then entrusted to maintain inviolate $4,269.40 on [A's] behalf.

(17) On or about November 18, 1987, respondent sent [A] a check for $1,220.60 dated November 18, 1987, drawn on [I's] "Attorney at Law, Client Account" at [J] Financial.

(18) From August 17, 1987 until November 18, 1987, the balance of respondent's client account was consistently less than the $4,269.40 still entrusted to him. The only time the balance in respondent's

client account was as much as the $4,269.40 was from September 10 through September 29, 1987. On November 16, 1987, the account balance was a negative $11.17.

(19) As a result of respondent forwarding to [A] a check in the amount of $1,220.60, on or about November 19, 1987, respondent was then entrusted to maintain inviolate $3,048.80 on [A's] behalf.

(20) By an October 24, 1988 letter, respondent's attorney, [K], sent [A's] current attorney, [L], respondent's check for $3,388.80, which included the $3,048.80 of [A's] funds still entrusted to respondent.

(21) From about November 18, 1987 until at least June 30, 1988, the balance of respondent's client account was almost always less than the $3,048.80 still entrusted to respondent on [A's] behalf, and thereafter the $3,048.80 remained misappropriated until at least October 24, 1988, when respondent's counsel sent [A's] attorney the aforementioned check for $3,388.80.

(22) Between November 18, 1987 and June 30, 1988, the only time the balance in respondent's client account was as much as $3,048.80 was from March 10 until March 14, 1988, and from May 5 until May 10, 1988. From April 11, 1988 until May 2, 1988, the account had a negative balance.

(23) From June 10, 1987, when respondent deposited the $8,000 check of [A's] settlement funds into his client account, until October 24, 1988, when respondent's attorney, [K], sent [A's] attorney respondent's check for $3,388.80, respondent failed to disburse any of the entrusted funds to [A's] medical providers despite numerous requests from representatives of the said medical providers and representatives of the collection agencies that he do so. However, $920.60 or the original entrustment due to

the medical creditors was paid directly to [A] by check on November 18, 1987.

(24) Based upon respondent's failure to maintain [A's] funds inviolate, he thereby misappropriated said funds.

## Charge 2

(25) As a result of respondent's deposit of the $8,000 check on [A's] behalf into his client account on June 10, 1987, described in charge 1, respondent was then entrusted to maintain inviolate $4,800 on [A's] behalf.

(26) On June 11, 1987, respondent deposited a check in the amount of $1,000 he received on behalf of his client [M] into his client account. Of that amount, respondent was entitled to receive $400 as a fee. He was entrusted to maintain inviolate the balance of $600.

(27) As a result of the deposit of the $1,000 check into his client account, on June 11, 1987, respondent was entrusted to maintain inviolate $5,400 on behalf of [A] and [M].

(28) Between June 11, 1987 and June 17, 1987, six checks totaling $8,733.31 cleared respondent's client account, including the checks for $2,000 and $4,233.31 described in paragraph 9, *supra,* none of the checks pertaining to [A's] or [M's] legal matters. Upon these checks clearing on June 17, 1987, the available balance was reduced to $309.07.

(29) As a result of respondent's deposit of the $1,000 check on [A's] behalf into his client account on June 18, 1987, respondent was entrusted to maintain a balance of $6,000 on behalf of [A] and [M]. On June 18, a check in the amount of $750, payable to respondent, cleared his client account. The available balance was thereby reduced to $559.07 and remained so until July 1, 1987.

(30) On July 1, 1987, respondent deposited into his client account a check in the amount of $13,500 he received regarding a settlement of a wrongful death claim concerning [N]. Of that amount, respondent was entitled to receive $2,700 as his fee and the attorney representing [N's] other parent was also entitled to receive $2,700 as his fee. Respondent was entrusted to maintain a balance of $8,100.

(31) As a result of the deposit of $13,500 check into respondent's client account, on July 1, 1987, respondent was entrusted to maintain inviolate $14,100 on behalf of [A], [M], and [O]. The available balance in respondent's client account was $12,055.90 at that time.

(32) Respondent issued a check in the amount of $3,028.50 dated July 10, 1987 made payable to [O], regarding the [N] matter, which cleared on July 13, 1987.

(33) As a result of the check clearing respondent's client account on July 15, 1987, respondent was entrusted to maintain inviolate $11,071.50 on behalf of [A], [M] and [O]. The available balance in respondent's client account was $2,028.48.

(34) On July 24, 1987, respondent deposited into his client account a check in the amount of $66,254.55 he received on behalf of a client, [P]. A check in the amount of $750, made payable to Dr. [Q], regarding [P], cleared respondent's client account on July 14, 1987, 10 days before the [P] proceeds were deposited. Of the $66,254.55, respondent was entitled to receive $16,563.63 as his fee. He was entrusted to maintain inviolate the balance of $48,940.92.

(35) As a result of the deposit of the $66,254.55 check into respondent's client account on July 24,

1987, respondent was entrusted to maintain inviolate $60,012.42 on behalf of clients [A], [M], [O] and [P].

(36) Subsequently, respondent issued the following checks from his client account:

(a) A check in the amount of $383, dated July 27, 1987, payable to [R] Funeral Home, regarding the [N] matter, which cleared on July 30, 1987;

(b) A check in the amount of $600, dated July 27, 1987, payable to [M], representing the balance of the entrusted funds owed to [M], which cleared on July 30, 1987;

(c) A check in the amount of $460, dated July 27, 1987, payable to [S], regarding the [N] matter, which cleared on July 31, 1987;

(d) A check in the amount of $250, dated July 30, 1987, payable to [T], regarding [P], which cleared on July 31, 1987; and

(e) A check in the amount of $500 dated July 30, 1987, payable to [U], regarding [P], which cleared on July 31, 1987.

(37) As a result of these checks clearing respondent's client account on July 31, 1987, respondent was entrusted to maintain inviolate $57,819.42 on behalf of [A], [O] and [P]. The available balance was $46,320.03.

(38) On August 5, and August 14, 1987, respondent deposited $6,400 and $4,000, respectively, of his own funds into his client account to replenish part of the deficit of client funds.

(39) By check in the amount of $48,190.92, dated August 6, 1987, payable to [P], which cleared respondent's client account on August 14, 1987, respondent paid [P] the balance of the entrusted funds owed to her.

(40) Respondent's deposit into his client account of $6,400 of his own funds on August 5, 1987 enabled

his check for $48,190.92 to clear his client account on August 14, 1987.

(41) As a result of the check clearing respondent's client account on August 14, 1987, respondent was entrusted to maintain inviolate $9,628.50 on behalf of [A] and [O]. The available balance in respondent's client account was $6,229.11.

(42) On August 17, 1987, the following checks cleared respondent's client account:

(a) A check in the amount of $1,130.60 dated August 14, 1987, payable to [A]; and

(b) A check in the amount of $4,228.50, dated August 13, 1987, payable to [V], by which respondent paid the balance of the entrusted funds regarding the [N] matter.

(43) As a result of these checks clearing respondent's client account on August 17, 1987, respondent was entrusted to maintain $4,269.40 on [A's] behalf. The available balance in respondent's client account was $370.01.

(44) On September 10, 1987, respondent deposited a check in the amount of $10,000 he received on behalf of his client [W] into his client account. Of that amount, respondent was entitled to receive $3,333.33 as his fee. Respondent was entrusted to maintain inviolate the balance of $6,666.67.

(45) As a result of the deposit of the $10,000 check into respondent's client account on September 10, 1987, respondent was entrusted to maintain inviolate $10,936.07 on behalf of [A] and [W]. The available balance in respondent's client account was $8,769.92.

(46) On September 21, 1987, and September 29, 1987, respondent deposited $1,000 and $1,500, respectively, of his own funds into his client account to replenish part of the deficit of client funds.

(47) On September 30, 1987, respondent's check in the amount of $6,666.67 dated September 28, 1987, payable to [W] cleared his client account. The check was initially presented for payment on September 29, 1987. The check was returned on September 30, 1987, because the funds were frozen pending the clearing of the item by which those funds were deposited thereto. Respondent's check for $6,666.67 cleared his client account on September 30, 1987, only because of respondent's deposit therein of the total of $2,500 of his own funds, described in paragraph 46, *supra*.

(48) Following clearance of that check from respondent's client account on September 30, 1987, respondent was still entrusted to maintain inviolate $4,269.40 on [A's] behalf. The available balance of respondent's client account was $53.25.

(49) From September 30, 1987 through November 18, 1987, the balance in respondent's client account was always less than $4,269.40 entrusted to respondent on behalf of [A].

(50) On November 18, 1967, respondent sent [A] the check in the amount of $1,220.60 (drawn on Attorney [I's] account), which reduced to $3,048.80 the amount of [A] funds still entrusted to respondent.

(51) On November 25, 1987, respondent deposited a check in the amount of $3,000 he received on behalf of his client [X] into his client account. Of that amount, respondent was entitled to receive $1,200 as the fee. He was entrusted to maintain inviolate the balance of $1,800 in his client account.

(52) As a result of the $3,000 deposit into respondent's client account, on November 25, 1987, respondent was entrusted to maintain inviolate

$4,848.80 on behalf of [A] and [X]. The available balance in respondent's client account was $3,005.33.

(53) On December 9, 1987, respondent's check in the amount of $1,800 dated December 9, 1987, payable to [X], which represented the balance of the entrusted funds owed to [X], clear his client account.  ·

(54) As a result of that check clearing respondent's client account on December 9, 1987, respondent was entrusted to maintain inviolate $3,048 on behalf of [A]. The available balance in respondent's client account was $8.81 and remained so until January 4, 1988.

(55) On January 4, 1988, respondent deposited $750 he received on behalf of his client, [Y], into his client account. Of that $750 respondent was entitled to receive $150 as his fee, and was entrusted to maintain inviolate the balance of $600.

(56) As a result of the deposit of $750 into respondent's client account, on January 4, 1988, respondent was entrusted to maintain inviolate $3,648.80 on behalf of [A] and [Y]. The available balance in respondent's client account was $602.52 and the available balance remained below $3,648.80 until March 10, 1988.

(57) On March 10, 1988, respondent deposited a check in the amount of $4,000 he received on behalf of his client [Z] into his client account. Of that amount, respondent was entitled to receive $1,775 as his fee and was entrusted to maintain inviolate the balance of $2,225.

(58) As a result of the $4,000 deposit into respondent's client account on March 10, 1988, respondent was entrusted to maintain inviolate $5,873.80 on behalf of [A], [Y] and [Z]. The available balance in respondent's client account was $4,112.87.

(59) On March 29, 1988, the available balance in respondent's client account had decreased to $1,565.34 by respondent issuing various checks, none of which related to these three clients.

(60) On March 29, 1988, respondent deposited a check in the amount of $1,000 he received on behalf of his client [AA] into his client account. Of that amount, respondent was entitled to receive $400 as his fee and was entrusted to maintain inviolate the balance of $600.

(61) As a result of the $1,000 deposited into respondent's client account on March 29, 1988, respondent was entrusted to maintain inviolate $6,473.80 on behalf of [A], [Y], [Z] and [AA]. The available balance was $2,535.34.

(62) On March 31, 1988, respondent's check in the amount of $2,225 dated March 30, 1988, payable to [Z], which represented the balance in the entrusted funds owed to [Z], cleared his client account.

(63) As a result of the check clearing respondent's client account on March 31, 1988, respondent was entrusted to maintain $4,248.80 on behalf of [A], [Y] and [AA]. The available balance in respondent's client account was $131.91.

(64) From March 31, 1988 until May 2, 1988, the account balance remained below $131.91. In fact, the account had a negative balance from April 11, until May 2, 1988 when respondent deposited $750 of his own funds to replenish part of the deficit of client funds. On May 5, 1988, respondent deposited an additional $3,000 of his own funds to replenish part of the deficit of client funds, which increased balance to $3,703.62.

(65) During May 1988, respondent issued the following checks from his client account:

(a) A check in the amount of $600 dated May 4, 1988, payable to [AA], representing the balance of

the entrusted funds owed to [AA], which cleared on May 10, 1988;

(b) A check in the amount of $600 dated May 4, 1988, payable to Mr. and Mrs. [Y], representing the balance of the entrusted funds owed to [Y], which cleared on May 26, 1988.

(66) These two checks cleared respondent's client account only because of respondent's deposit therein of the total of $3,750 of his own funds.

(67) As a result of these checks clearing respondent's client account on May 26, 1988, respondent was entrusted to maintain inviolate $3,048.80 on behalf of [A]. The available balance in respondent's client account was $451.62.

(68) From May 26, 1988 until at least June 30, 1988 the balance of respondent's client account remained below $451.62. From June 1 until June 6, 1988, the available balance was $87.98. From June 6, until at least June 30, 1988, the available balance was $7.98.

(69) From June 10, 1987 until at least June 30, 1988, respondent issued numerous checks from his client account for personal business expenses in excess of earned fees.

(70) Some of the checks written on respondent's client account were for various businesses including [BB], where respondent's wife would have her hair cut, to [CC], where respondent purchased cigarettes and soda pop, [DD] Grocery Store, all of which were admitted misappropriations or mispayments from respondent's escrow account. (Transcript of disciplinary hearing at 100-1, May 15, 1989).

(71) Although the petition for discipline contains two charges, this matter arose out of a single complaint to petitioner.

(a) [A] was the only client to complain to petitioner concerning this matter.

(b) The allegations of charge II are based upon information voluntarily provided to petitioner by respondent.

(72) All of respondent's clients have received all of the funds due them.

(73) Respondent greatly cooperated with petitioner in its investigation of this matter and petitioner's audit of respondent's account.

(74) Respondent's cooperation and candor greatly facilitated petitioner's investigation and prosecution of this matter.

## CONCLUSIONS OF LAW

### Charge I

(1) The board adopts the finding of the hearing committee with regard to a violation of rule 1-102(A)(4) — conduct involving dishonesty, fraud, deceit, or misrepresentation. The evidence clearly shows that respondent failed to maintain inviolate the funds entrusted to him by his client, [A], from June 1987 until late October 1988, and that he misappropriated [A's] funds. Respondent failed to disburse any of the entrusted funds owed to [A's] medical providers, directed to said medical providers or to any collection agency acting on behalf of the said medical providers, as he had agreed to do, despite numerous requests from representatives of the providers and their collection agencies that he do so. Respondent also failed to return the balance of entrusted funds he received in June 1987, on [A's] behalf, to [A] until late October 1988. All of this was done despite numerous requests from the client [A] regarding respondent's handling of his funds.

(2) The board adopts the finding of the hearing committee for a violation of rule 1-102(A)(6) — conduct that adversely reflects on fitness to practice law. Respondent's failure to take any action over

the 16 months when he was in control of the client's funds, in regards to the client's medical expenses and bills, reflects an inability to exhibit the fitness required to practice law in the Commonwealth of Pennsylvania.

(3) The board finds that there is no violation of rule 9-102(A) — requiring all funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, are to be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated, and no funds belonging to the lawyer or law firm shall be deposited therein; except funds reasonably sufficient to pay bank charges and funds belonging in part presently or potentially to the lawyer or law firm. The facts show that respondent did deposit all of the funds into the required account. His removal of those funds without authorization of the client constitutes a different disciplinary rule violation, and we are not persuaded that his subsequent redeposit of funds into his client account to make up for previously created shortfalls mandates a violation of that part of this rule which states ''no funds belonging to the lawyer or law firm shall be deposited therein.'' That interpretation would make it impossible for a lawyer to undo an injustice to his client without further violating the disciplinary rules. The board does not consider this technical lack of a violation of this rule to be significant, since there is a violation of rule 1.15(a) dealing with the same subject matter.

(4) The board adopts the finding of the hearing committee that there is a violation of rule 1.15(a) — funds held by a lawyer on behalf of clients or third persons shall be kept in a separate account maintained in the state where the lawyers office is situated or elsewhere, with the consent of the client

or third person. This rule requires that the funds of the client be "kept in the client or trustee account," and under the facts presented, those funds clearly were not kept in the account. Any previous problem with the wording of rule 9-102(A) was in fact cured by rule 1.15(a). Consequently there is no great significance to respondent not violating rule 9-102(A).

(5) The board adopts the finding of the hearing committee that there is a violation of rule 1.15(b) — a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and upon request by the client or third person shall promptly render a full accounting regarding such property. Respondent here was repeatedly requested to account for the funds and their whereabouts, and for his failure to properly disburse them. Therefore, respondent wrongfully withheld [A's] funds and wrongfully failed to inform [A] of how his account and funds were being handled.

(6) The board finds that rule 8.4(c) — engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation — was violated with regard to [A] when the client requested the status of his case, and was told by respondent that the matter was being taken care of. At the time that respondent made this misrepresentation to his client, he knew that the funds were misused.

## Charge 2

(1) The board adopts the finding of the hearing committee that there is a violation of rule 1-102(A)(4) — engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Respondent admittedly failed to keep inviolate funds en-

trusted to him by eight clients in addition to the client [A] during the time period of June 1987, to late May 1988. Therefore, he also misappropriated these additional client's funds.

(2) The board adopts the finding of the hearing committee that there is a violation of rule 1-102(A)(6) — engaging in conduct that adversely reflects on his fitness to practice law. Respondent's commingling of the funds of the nine different clients as well as his failure to respond to the request of client [A] to account for the whereabouts and handling of his funds displays a pattern of fraudulent and dishonest conduct which reflects on respondent's moral fitness and his fitness to practice law.

(3) As previously set forth under charge 1, the board finds no violation of rule 9-102(A), but does adopt the finding of the hearing committee that there is a violation of rule 1.15(a).

(4) The board adopts the finding of the hearing committee that there is a violation of rule 8.4(c) — engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. This relates to the unauthorized removal of money from clients. It does not relate to any misrepresentations to any of the clients involved in strictly charge 2.

## DISCUSSION

Although the board has some differences from the findings of fact and conclusions of law made by the committee, the essential offending conduct is not in dispute. The matter before us, as it was before the committee, is the proper discipline to be imposed. Both petitioner and respondent have done well in presenting to the board the various disciplines imposed in client conversion cases. While there is no per se rule a review of the cases seems to make the

format for disposition simply this: when there is a conversion of a client's funds some form of public discipline will be imposed, which will vary depending on the mitigating or aggravating circumstances of the particular case. *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981); *Matter of Green,* 470 Pa. 164, 368 A.2d 245 (1977); *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981); and, *Office of Disciplinary Counsel v. Hermann,* 475 Pa. 560, 381 A.2d 138 (1977).

Unquestionably when the unauthorized conversion of client funds is aggravated with misrepresentation, the discipline imposed is more severe. *Office of Disciplinary Counsel v. Kanuck,* 517 Pa. 160, 535 A.2d 69 (1987) (five-year suspension); *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983) (disbarment); *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982) (disbarment). However, this record in no way supports misrepresentations to clients other than [A]. The committee did not make this finding of fact, but in its discussion does refer to misrepresentations to clients in the plural. The committee, in its discussion, clearly intended to convey that there were numerous misrepresentations to numerous clients. Petitioner did not charge respondent with client misrepresentations. And, the record is completely devoid of any misrepresentation to any client, other than [A]. The limited nature of the representation made to [A] when that client asked the status of medical creditor payments, was that "I am taking care of it." In fact, no client lost any money. The record supports respondent's exception on this point.

Therefore, the offending conduct is a misappropriation of client funds which continued for a period of 16 months.

Mitigating factors are found in that:

(1) Respondent's disciplinary history contains only an informal admonition in 33 years of practice;

(2) Respondent undoubtedly saved the disciplinary system time and expense by forthrightly presenting to the Office of Disciplinary Counsel the infractions in which he had engaged. In fact, there was only one complainant ([A]), with the other infractions being revealed by respondent voluntarily (see *Matter of Leopold,* 469 Pa. 384, 366 A.2d 227 (1976)); and,

(3) Respondent has enjoyed a good reputation in the legal community and with the public at large.

In the dispositional hearing before the committee, [EE], Esq., a former judge and now a practitioner in [ ] County, testified as to respondent's good reputation both among the judiciary and his fellow lawyers. [FF] and [GG] testified as to respondent's good reputation in the public. While the board has limited differences with the committee which reviewed this matter, those differences actually are what sustain the committee's recommendation for discipline.

The grievous nature of the offense is that respondent converted client funds to his own use, and this continued for a significant period of time. Because the record does not support misrepresentations to clients as described by the committee in its discussion, the board finds that the committee's recommendation on discipline is appropriate and supported by precedent. A knowing misappropriation, without aggravating circumstances, and the same mitigation as shown here, will result in a two-year suspension. In *In re Anonymous no. 50 D.B. 87,* 3 D.&C. 4th 627, the misappropriation lasted for almost the same length of time as here; the money was used for the same purposes; and, the mitigation

was substantially the same. Certainly, the court is consistent in holding that each case of conversion of funds is evaluated individually. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 471 A.2d 186 (1983). But here our de novo review, which alters some facts and conclusions made by the hearing committee, results in the board coming to the same dispositional recommendation.

## RECOMMENDATION

The board unanimously recommends to the Supreme Court of Pennsylvania that respondent be suspended for a period of two years, and that he be ordered to pay the cost of these proceedings.

Ms. Heh and Mr. Stoelker did not participate in the adjudication.

## ORDER

And now, June 4, 1990, upon consideration of the report and recommendation of the Disciplinary Board dated January 5, 1990, the petition for review and the answer thereto, the petition for review is denied, and it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of two years, and he shall comply with all the provisions of rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to rule 208(g), Pa.R.D.E.

Mr. Justice Larsen did not participate in this matter.