## Office of Disciplinary Counsel v. Wiener

Disciplinary Board Docket no. 2 D.B. 99.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

TETI, *Member,* December 16, 2002—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

By order of January 12, 1999, the Supreme Court of Pennsylvania placed respondent, Eric Jeffrey Wiener, on temporary suspension from the practice of law as a result of his criminal conviction of two counts of wire fraud, in violation of 18 U.S.C. §1343.

On March 21, 2000, a petition for discipline was filed against respondent by petitioner, Office of Disciplinary Counsel. Respondent filed an answer to petition on May 12, 2000. Assignment of the case to a Hearing Committee was deferred until respondent was released from prison.

A disciplinary hearing was held on September 25, 2001 before Hearing Committee 3.04 consisting of Acting Chair Lenora M. Smith, Esquire, Member Donald H. Brobst, Esquire and Alternate Member Patrick E. Dougherty, Esquire. Respondent was represented by James C. Schwartzman, Esquire.

Following briefing by the parties, the Hearing Committee filed a report on May 10, 2002 and recommended that respondent be suspended from the practice of law for four years. No briefs on exception were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting of June 12, 2002.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office was located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania 15219, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born in 1946 and was admitted to practice law in Pennsylvania in 1973. He resides at 4505 Lakeside Drive, Harrisburg, PA 17110. He is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) By order of the Supreme Court of Pennsylvania dated January 12, 1999, respondent was placed on temporary suspension as a result of his criminal conviction in the United States District Court for the Middle District of Pennsylvania of two counts of wire fraud.

(4) The facts underlying the conviction are as follows:

(a) Respondent was a one percent owner and authorized sales agent of Carlisle Auto Plaza Inc. (CAP), a used car dealership located in Carlisle, PA.

(b) On or about July 14, 1994, respondent purchased a 1994 Jeep Cherokee from Hugh R. Jones of Jones Motor Cars Ltd., for $26,500. Although the sale was transacted under CAP's name, the Jeep was used by respondent and was purchased with monies he controlled.

(c) Prior to September 16, 1994, respondent learned that several Jeeps Jones had sold had been seized as stolen vehicles by Pennsylvania law enforcement authorities.

(d) By letter dated September 16, 1994, respondent advised Jones and CAP's insurance carriers that CAP had purchased a Jeep from Jones and that some of the Jeeps sold by Jones were under suspicion of being stolen. Respondent inquired as to whether Jones' policy provided coverage and directed the carriers to "please present a claim on behalf of Carlisle Auto Plaza Inc."

(e) Respondent was advised that there was a question as to whether there was coverage under Jones' policy.

(f) Thereafter respondent placed advertisements in the *Philadelphia Inquirer* and the *New York Times* listing the Jeep for sale for $26,900.

(g) Upon seeing the advertisement, on September 22, 1994, Joseph Grow, a used car dealer from West Chester, PA, traveled to Harrisburg to inspect the Jeep at respondent's residence. Respondent told Grow he was selling the Jeep because he wanted a larger vehicle for towing. Grow made an offer for less than $26,900, and respondent refused it.

(h) Two days later, respondent contacted Grow in Florida and said he reconsidered.

(i) Grow returned to Pennsylvania and met with respondent in Harrisburg. At that time, Grow discovered the Jeep was a Canadian vehicle and refused to go through with the transaction.

(j) After seeing the advertisements in the *New York Times* and *Philadelphia Inquirer,* Robert Gullo of New Jersey had several telephone conversations with respondent regarding the Jeep, on September 24 and 25, 1994, while Gullo was in New York.

(k) After the sale to Grow fell through, respondent agreed to sell the Jeep to Gullo for $26,500. Respondent conditioned the sale on Gullo's traveling to Harrisburg on September 27, 1994 and taking possession of the vehicle.

(l) On September 27 1994, respondent applied for and received a Pennsylvania title for the Jeep in CAP's name.

(m) On September 27, 1994, Gullo arrived at respondent's residence to inspect the Jeep. Respondent told Gullo he was selling the Jeep because he wanted a larger vehicle for towing.

(n) When Gullo expressed his concern about the Jeep being titled in CAP's name, respondent told Gullo he

was a lawyer and an authorized representative of CAP. Not convinced, respondent took Gullo to his law firm and showed him documents authorizing respondent to act on CAP's behalf. Gullo agreed to buy the Jeep.

(o) On September 28, 1994, respondent deposited Gullo's cashier check into an account he controlled at Mellon Bank in Harrisburg.

(p) On September 30, 1994, respondent advised CAP's insurance carrier that the matter involving the Jeep had been resolved.

(q) On November 18, 1994, law enforcement authorities seized the Jeep from Gullo in New Jersey.

(r) By correspondence of November 22, 1994, Gullo's attorney demanded a refund of the purchase price.

(s) Respondent asked the buyer to permit him to pursue a claim against the insurance companies.

(t) Respondent knew that it appeared those companies were declining coverage.

(u) Despite Gullo's repeated demands, respondent did not refund the $26,500 until after he was interviewed by the FBI about the Jeep in July of 1995.

(5) Respondent was charged in a three-count indictment of two counts of wire fraud and one count of sale of a stolen motor vehicle. He entered a plea of not guilty to all three counts on December 12, 1995. On April 29, 1997, a jury entered verdicts of guilty on the wire fraud counts and deadlocked on the third count.

(6) On October 7, 1998, respondent was sentenced to 15 months imprisonment, supervised release for one year, plus fines.

(7) The court increased the offense level by two for obstruction of justice, pursuant to U.S.S.G. §3C1.1, based upon certain testimony of respondent.

(8) The section 3C1.1 determination was based on the trial judge's finding, by clear and convincing evidence, that respondent gave false testimony on a material matter and that he did so with willful intent to provide false testimony.

(9) Respondent's false testimony was based on the reasons he articulated for selling the Jeep. Those reasons were that the prices were declining on similar Jeeps at the Manheim Auto Auction and that he wanted to avoid a loss, and that he wanted a larger vehicle for towing a trailer.

(10) The court determined that the true reasons for respondent selling the Jeep in the manner he did was to avoid a loss because it was stolen and because he had determined that there was no insurance coverage for such a loss.

(11) Respondent acknowledged in these proceedings that the primary reasons he wanted to sell the Jeep were because he was fearful it was stolen and he did not want to lose the $26,500 he had paid for it.

(12) Respondent admits that his failure to provide more timely restitution was caused by greed.

(13) Respondent was in private practice for approximately 25 years. Respondent has no history of discipline.

(14) Respondent expressed remorse.

## III. CONCLUSIONS OF LAW

The board makes the following conclusions of law:

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct and Rules of Disciplinary Enforcement:

(1) Pa.R.D.E. 203(b)(1)—Respondent's conviction for wire fraud constitutes a conviction of a serious crime and is an independent basis for discipline;

(2) R.P.C. 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(3) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and,

(4) R.P.C. 8.4(d)—It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

## IV. DISCUSSION

This matter is before the Disciplinary Board upon a petition for discipline charging respondent with violation of the Pennsylvania Rules of Professional Conduct and Pennsylvania Rules of Disciplinary Enforcement based on his conviction of two counts of wire fraud.

When a disciplinary proceeding is commenced against an attorney based upon a criminal conviction, the board's sole responsibility is to determine the appropriate measure of discipline relative to the seriousness of the crime. *Office of Disciplinary Counsel v. Eilberg,* 497 Pa. 388,

441 A.2d 1193 (1982). All aggravating and mitigating circumstances must be taken into consideration in the board's final analysis of discipline. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983).

Respondent's conviction involved illegal conduct engaged in for personal gain, followed by a string of untruths made in an attempt to avoid financial responsibility, culminating in false testimony at his criminal trial. These actions denote serious character deficiencies. Respondent bought a Jeep for $26,500 and thereafter learned that similar Jeeps bought from the same individual were stolen. He contacted insurance companies and was advised that if his vehicle was stolen there was no coverage. Respondent decided to advertise the vehicle in out-of-town newspapers to avoid any possible local embarrassment. In discussions with potential buyers, he did not reveal his primary concern that the Jeep was stolen. After the Jeep was seized from the New Jersey buyer, demand was made of respondent for the return of the $26,500 the buyer paid him. Respondent told the buyer that he would try to get some recovery from the insurance companies, although respondent knew that those companies would decline coverage based on his earlier conversations with them. Respondent refused an offer from the buyer to settle for $15,000. Only after respondent became a target of an FBI investigation did he make full restitution to the buyer. Respondent compounded his troubles by testifying falsely at his criminal trial as to his reasons for selling the Jeep. This false testimony is a significant aggravating factor as to the appropriate degree of discipline.

Respondent's misconduct did not involve any client or his practice of law; however, that does not negate the need for discipline nor does it render the acts less serious. *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981).

There are numerous attorney discipline cases involving fraud, oftentimes in combination with some other crime, such as conspiracy. In the matter of *Office of Disciplinary Counsel v. Valentino,* 556 Pa. 609, 730 A.2d 479 (1999), Mr. Valentino was convicted of mail fraud, which was found to have been considerably aggravated by his subornation of perjury. He induced his mother to testify falsely before a grand jury. He was never charged with subornation of perjury but that misconduct was clearly considered as an aggravating factor in determining his discipline. The Supreme Court imposed a five-year suspension.

An attorney was convicted of two counts of mail fraud and two counts of aiding and abetting after he submitted inflated medical bills to an insurance company. He was suspended for three years. The board considered that the incident was isolated and the attorney had no prior history of discipline and showed remorse. *In re Anonymous No. 139 D.B. 95,* 151 Disciplinary Docket no. 3 (Pa. June 13, 1997).

Respondent has no record of discipline, he has complied with all of the Rules of Disciplinary Enforcement pertaining to suspended attorneys, and he has cooperated with petitioner in the consideration of this matter. At the disciplinary hearing, respondent acknowledged that his trial testimony was not candid, and he did set

forth the true reasons for selling the Jeep. Respondent has shown remorse for his actions. Balancing all of these factors, the board is persuaded that a suspension of four years retroactive to respondent's temporary suspension is appropriate.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, Eric Jeffery Wiener, be suspended from the practice of law for a period of four years, retroactive to January 12, 1999.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Peck dissented and would recommend a five-year suspension.

Board Members Schultz and McLaughlin did not participate in the June 12, 2002 adjudication.

## ORDER

And now, February 28, 2003, upon consideration of the report and recommendations of the Disciplinary Board dated December 16, 2002, it is hereby ordered that Eric Jeffrey Wiener be and he is suspended from the bar of this Commonwealth for a period of five years retroactive to January 12, 1999, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Nigro dissents and would suspend respondent for a period of four years.