**In re Anonymous No. 81 D.B. 87**

Disciplinary Board Docket no. 81 D.B. 87.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

GILARDI, *Member,* April 15, 1991—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

Respondent is a 39-year-old [D] County attorney who was admitted to practice law in the Commonwealth of Pennsylvania in 1978.

On October 27, 1987, the Office of Disciplinary Counsel filed a petition for discipline, docketed at No. 81 D.B. 87. The petition contained four separate charges of misconduct, and alleged that respondent violated the following Disciplinary Rules three times with regard to her handling of clients' affairs:

(a) D.R. 1-102(A)(3)—which prohibits an attorney from engaging in illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) D.R. 1-102(A)(6)—which prohibits an attorney from dealing in conduct that adversely reflects on his fitness to practice law;

(d) D.R. 9-102(A)—which requires that all funds of clients paid to an attorney, except for advances

for costs and expenses, be kept in identifiable bank accounts in the state in which the attorney's·office is located and that no funds belonging to the attorney shall be deposited therein except for funds sufficient to pay bank charges and funds belonging in part to the client and in part to the attorney;

(e) D.R. 9-102(B)(3)—which requires an attorney to maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and to render appropriate accounts to the client regarding them; and

(f) D.R. 9-102(B)(4)—which requires an attorney to promptly pay or deliver to a client as requested by the client funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

The petition also alleged one violation of D.R. 6-102(A), which prohibits an attorney from attempting to exonerate herself from or limit her liability to her clients for her personal malpractice, based on respondent's mishandling of client affairs. Additionally, the petition charged respondent with violation of D.R. 1-102(A)(3), D.R. 1-102(A)(4) and D.R. 1-102(A)(5), which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice; and D.R. 1-102(A)(6), for her alleged misconduct when contacted by the Office of Disciplinary Counsel about possible Disciplinary Rule violations, although these allegations were subsequently dropped. (Exh. P-1.)

On December 22, 1987, respondent filed her answer to the petition for discipline. Respondent admitted to failing to make prompt payment of entrusted client funds and to writing checks against the account containing client funds, but denied intentional conversion of client funds or any Disciplinary Rule violations. Furthermore, respondent intro-

duced the additional information about her health, personal, and office problems during the time when the alleged misconduct occurred. (Exh. P-2.) This matter was referred to Hearing Committee [ ], which was chaired by [ ].

The Disciplinary Board issued numerous orders in 1988 and 1989:

(1) On November 18, 1988, the Disciplinary Board granted respondent's request for a continuance in order to furnish the Office of Disciplinary Counsel authorization to obtain respondent's medical records.

(2) On November 28, 1988, the Disciplinary Board issued an order denying acceptance of respondent's medical records by virtue of her non-compliance with the order of November 18, 1988.

(3) On December 1 and 6, 1988, the Disciplinary Board issued orders which granted the petition of respondent's counsel to withdraw and continued the matter until January 12, 1989.

(4) On January 11, 1989, the Disciplinary Board denied continuance of the hearing.

(5) On January 12, 1989, the hearing committee chairperson's request for a continuance was granted.

(6) On May 4, 1989, the Disciplinary Board granted a continuance due to the absence of a member of the hearing committee.

Hearings on the matter were held before Hearing Committee [ ] on: October 19, 1988; December 6, 1988; January 4, 1989 (investigatory hearing); January 12, 1989; February 7, 1989; February 21, 1989; March 8, 1989; March 27, 1989; April 19, 1989; and May 22, 1989.

On October 11, 1989, the Office of Disciplinary Counsel submitted its memorandum to the hearing committee on the issue of Disciplinary Rule violations.

On December 14, 1989, respondent's counsel filed a response to petitioner's memorandum.

On January 16, 1990, the Office of Disciplinary Counsel filed a memorandum on the appropriate discipline to be imposed.

On August 7, 1990, Hearing Committee [ .] filed its report on the matter, and recommended that respondent be suspended from the practice of law, but that the suspension be stayed and respondent be placed on probation for a period of three months.

On August 16, 1990, the board issued an order granting petitioner's request for a one week extension to file a brief on exceptions to the hearing committee report.

On August 31, 1990, the Office of Disciplinary Counsel filed a brief on exceptions to the hearing committee report.

On September 21, 1990, respondent's counsel sent a letter to the chairman of the board requesting the unpublished file of a separate attorney whose case respondent's counsel believed would assist his client.

On October 2, 1990, board chairman [ ] denied respondent's counsel access to confidential disciplinary records of another attorney under Rule 402, Pa.R.D.E.

On October 11, 1990, respondent filed a motion to dismiss both the Office of Disciplinary Counsel's exceptions and the petition for discipline.

The matter was adjudicated at the January 4, 1991 meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## SUMMARY OF EVIDENCE

The Disciplinary Board adopts the findings of fact made by the hearing committee. Those findings are appended hereto.

The alleged misconduct in this case stems from respondent's representation of [A], [B] and [C]. In each instance, respondent negotiated a settlement of the client's civil matter.

[A] had retained respondent to represent him in a claim in which he had sustained personal injuries as a result of a vehicular accident in [ ], New Jersey. Respondent agreed to represent [A] on a 33 and one-third percent contingency fee basis. Respondent filed suit on his behalf on or about March 29, 1982 in [ ] County, New Jersey, where she is also licensed to practice law. On or about July 24, 1983, respondent received a settlement offer of $15,000, which [A] accepted. Between July 28 and July 31, 1983, [A] executed a settlement release in favor of the defendant and her insurer.

On August 1, 1983, respondent received a check from the defendant's insurer for $15,000 payable to [A] and respondent. Respondent promptly deposited the check into her overdrawn [E] Bank account. Respondent deposited additional funds into the account and wrote personal and professional checks against the account without [A's] knowledge or consent during the period of August 2 through September 1, 1983.

In November 1983, respondent removed her law office from the [D] location she had occupied since December 1980. She continued to communicate with [A] using letterhead bearing her old address.

In or about November 1983, respondent closed the account in [E] and opened an account at [F] Savings and Loan.

On March 9, 1984, respondent withdrew $10,015.05 from the [F] account to purchase a cashier's check, which [A] picked up at her office. (Exh. P-3 at 12a, 19, 20, 21, 24, 25, 28-38, 105, 106.)

The [B] matter is similar to the [A] case. [B] retained respondent in July 1982 to represent her in a personal injury claim against [G] which, resulted from a vehicular collision. [B] executed a contingency fee agreement in which respondent would receive 40 percent of the recovered funds, plus reimbursement for any costs incurred.

On February 22, 1983, respondent filed suit on [B's] behalf against [G]. In early December 1983, [G] offered [B] a settlement of $10,000, which she agreed to accept.

On December 22, 1983, respondent deposited [B's] $10,000 settlement check from [G] into her [F] Savings and Loan attorney account, which had a balance of $87.93. Between the date of deposit and March 9, 1984, respondent wrote checks from this account for personal and professional obligations, without [B's] knowledge or consent, and overdrew the account.

In January and February 1984, respondent contacted [B] using her then inactive [   ] address, and informed the client that she was entitled to $5,964.09, an amount less than [B] believed she should receive.

After numerous unsuccessful attempts to recover her money, [B] secured new counsel and on March 9, 1984, received $6,067.63 ($6,000 plus interest) in the form of a cashier's check. (Exh. P-22, 22a, 23, 23a, 39-59.)

Like [B] and [A], [C] retained respondent to represent him in a civil action. In or about September 1982, [C] and [H], [C's] counsel, asked respondent to serve as lead counsel in a civil action and to

pursue [C's] workers' compensation claim. As part of the agreement, respondent was entitled to 40 percent of any funds recovered from the claim, plus reimbursement for costs.

In February 1984, respondent, with [C's] authorization and consent, reached a settlement of all claims for $80,000.

On February 26, 1984, respondent and [C] endorsed three settlement accounts totaling $80,000, which she immediately deposited into her overdrawn bank account. Between February 27, 1984 and March 31, 1984, respondent wrote checks against [C's] funds, without his authorization or consent, to satisfy her professional and personal obligations. Respondent failed to present or account for any settlement proceeds to [C] despite his repeated requests. [H], Esq., wrote to respondent in April and May 1984, requesting [C's] funds.

On May 11, 1984, when respondent closed the account which had held [C's] funds, her bank balance was $25,144.19. On June 22, 1984, respondent used a combination of funds to obtain a treasurer's check for $45,547.91 payable to the [Cs]. Acting on the advice of her co-counsel, and considering the fact that respondent and [H] were involved in a co-counsel fee dispute, respondent sought to obtain a release of liability from the [Cs] as a condition of surrendering their check. (Exh. P-63 through 86; N.T. 1/12/89 at 88-118.)

During the 1983 through 1984 time period when the misconduct occurred, respondent was hospitalized numerous times for renal and back problems and severe pregnancy complications, and was also involved in extensive personal litigation, some of which arose out of family deaths.

## DISCUSSION

There are several issues before the Disciplinary Board in the instant matter. The questions which must be addressed by the board are: (1) what, if any, Disciplinary Rules were violated by respondent; (2) whether a finding of Disciplinary Rule violations must be set aside because respondent's due process rights were violated as she has alleged; and (3) the appropriate discipline to be imposed, taking into account any possible mitigating factors.

Petitioner bears the burden of proving respondent's professional misconduct. Evidence is sufficient to prove unprofessional conduct if a preponderance of that evidence establishes the charged violation and the proof of such conduct is clear and satisfactory. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). The evidence must demonstrate misconduct in a way that is both clear and satisfactory. We find that petitioner has met this burden of proof.

The Disciplinary Board has carefully scrutinized the record, and we are satisfied that the triers of fact have properly evaluated the evidence. Accordingly, we have adopted the hearing committee's findings of fact (see appendix).

The voluminous record, as well as respondent's testimony before Hearing Committee [ ] and her answer to the petition for discipline all illustrate that in three separate instances respondent misappropriated client funds in order to satisfy professional and personal financial obligations. (See N.T. 27, January 1, 1990.) Respondent's bank records show that she deposited the settlement checks she received on behalf of [A], [B], and [C] into non-segregated bank accounts against which she subsequently wrote checks to cover personal and professional expenditures, causing the account balances to fall below the

amount of funds held in trust for her clients. (Exh. P-11a-d, 12, 13a, 13b, 14a, 14b, 15a-i, 16a-g, 17a, 18a, 18b; N.T. 1/12/89 at 79-84, 118-31.) Respondent then made various misrepresentations to her clients in an effort to conceal her misappropriation of their settlement proceeds. (N.T. 1/12/89 at 25-78, 88-118.)

Petitioner has alleged that by participating in the aforementioned conduct, respondent engaged in a dishonest, fraudulent course of action which adversely reflects upon her fitness to practice law, in violation of D.R. 1-102(A)(3), D.R. 1-102(A)(4), and D.R. 1-102(A)(6). It is petitioner's contention that respondent failed to maintain a properly documented inviolate, segregated bank account from which she could have promptly paid the settlement proceeds her clients were entitled to receive, in violation of D.R. 9-102(A), D.R. 9-102(B)(3), and D.R. 9-102(B)(4).

The testimony of respondent's former clients and bank officials, and the bank records which were received into evidence, prove that respondent did in fact violate the Disciplinary Rules as alleged by petitioner.

The Office of Disciplinary Counsel alleged an additional Disciplinary Rule violation in the [C] matter. Petitioner charged respondent with violating D.R. 6-102(A) by requiring [C] to sign a release in order to obtain his settlement proceeds. At the point at which respondent was required to tender [C's] funds, respondent was acting on the advice of her counsel because she was involved in a co-counsel fee dispute with the attorney who had referred the [C] matter to her. Because of the co-counsel fee dispute and possible questions about the amount owed to respondent, the board finds that petitioner has failed to prove by clear and satisfactory evidence that respondent violated D.R. 6-102(A). Ad-

ditionally, the board notes that petitioner failed to sustain the burden of proving this rule violation. (See exh. P-80, 81, 86).

Having determined that respondent's conduct violated several Disciplinary Rules, the next issue is whether she has been afforded fair and ample opportunity to defend herself in these proceedings. On October 11, 1990, respondent's counsel filed a motion to dismiss the petition for discipline on the grounds that respondent was denied access to the [I] file, a similar case which contained citations to other relevant matters possibly favorable to respondent. Respondent and her counsel contended that because she was denied access to the [I] case, her due process rights had been violated, and therefore, the petition for discipline should be dismissed.

Respondent was denied access to the [I] file based on Rule 402 Pa.R.D.E., which assures the confidentiality of unreported Disciplinary Board adjudications. Although respondent was denied access to the unpublished [I] file so as to protect the privacy of the respondent in that matter and maintain the confidentiality of the Pennsylvania attorney discipline system, she was provided with the case citations contained in the file. Respondent was therefore not deprived of access to potentially favorable disciplinary case law, and thus, her right to defend herself from the charges of misconduct, using relevant case law, was not denied.

Because respondent was afforded access to the citations which could possibly assist her in her defense to the charges of misconduct, the board's finding that she violated various Disciplinary Rules is fair and need not be set aside, based on the argument contained in respondent's motion to dismiss.

The final issue before the Disciplinary Board is therefore the appropriate measure of discipline to be imposed on respondent. The correct disciplinary sanction will protect the interests of the public and maintain the integrity of the bar. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987).

We do note that all of respondent's clients were repaid with interest. However, mere restitution does not diminish the seriousness of respondent's conduct, nor does her claim that she did not intend to misappropriate clients' funds. As the Supreme Court noted in the *Kanuck* case, "the unauthorized use of client funds is inexcusable even when accompanied by an intent to return them." *Office of Disciplinary Counsel v. Kanuck,* 517 Pa. 160, 535 A.2d 69 (1987); *In re Anonymous No. 16 D.B. 88,* no. 690 Disc. Dkt. no. 2 (1989). Thus, the question of whether respondent intended to convert clients' settlement proceeds is not germane to the determination of discipline to be imposed for such a transgression.

The board notes from the outset, two critical factors which are important to consider when ascertaining the appropriate discipline in this matter. First, we acknowledge that prior to the instant proceedings, respondent had an unblemished disciplinary record in Pennsylvania. Second, we recognize that the misconduct occurred during the limited time frame of 1983 through 1984. It is therefore incumbent upon the board to consider any possible mitigating facts which may have occurred in respondent's life during 1983 through 1984.

During the period in question, respondent experienced a physically stressful, debilitating pregnancy, two deaths in her family, chronic pain syndrome, which is defined as a "medical problem or abnor-

mality that leads to persistent and severe pain that is not well treated by mechanical or surgical means . . . usually of a degree that it interferes with normal daily functioning and limits physical activity" (N.T. 5/22/89 at 10), and personal involvement in extensive civil litigation. (Exh. P-87 through 97; N.T. 5/22/89 at 6-35, 42-90.) Additionally, we note that respondent was the subject of an unsuccessful Rule 301 proceeding which, if successful, would have resulted in her being declared incompetent, and alternatively lends credence to the existence of serious problems in respondent's life.

Respondent introduced the testimony of Dr. [J] and Dr. [K] in an effort to establish a causal connection between her misconduct and her poor health. (N.T. 5/22/89 at 6-17, 26-37.) In Pennsylvania, "psychiatric disorder is an appropriate consideration as a mitigating factor in a disciplinary proceeding." *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989). However, in order for a psychiatric or medical disorder to be considered in mitigation of attorney misconduct, expert testimony must establish a causal connection between the affliction and egregious conduct. See also, *In re Anonymous No. 16 D.B. 88, supra.*

Although respondent proffered testimony by two qualified experts that she has experienced both physical and psychological health problems, she has failed to sustain her burden of establishing the nexus between her ailments and her misconduct. We reach this conclusion by noting that Dr. [J], a neurosurgeon, did not examine respondent until 1985, one year after her misconduct, while Dr. [K], a psychiatrist, did not see respondent until 1987. Furthermore, although Dr. [J] diagnosed respondent with "la belle indifference" and Dr. [K] treated her for mild depression, both experts failed to testify as to a

causal connection between respondent's conduct and possibly diminished capacities. For this reason, the board concludes that although respondent has obviously suffered from various infirmities, we will not consider her psychiatric or medical problems as a mitigating factor when imposing discipline, since she has failed to prove the requisite causal connection between her infirmities and her professional misconduct.

In light of the limited time period during which respondent's misconduct occurred; her acknowledgment of the factual basis on which these proceedings were based; the unusual and extremely stressful circumstances which occurred in respondent's life at the time of her misconduct; and the highly favorable testimony of three practicing attorneys who told the hearing committee it was their opinion that respondent's Disciplinary Rule violations were an aberration which had not precluded their subsequent working with her (N.T. 1/4/90 at 5-12, 13-21, 41-46), the board concludes that respondent's suspension from the practice of law for a period of three years will satisfactorily acknowledge the seriousness of her misconduct, protect the interests of the public, and uphold the integrity of the bar.

## DETERMINATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent [    ] be suspended from the practice of law for a period of three years.

It is further recommended that the court direct that respondent pay all the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Mr. Eckell dissented and would recommend a five-year suspension.

Messrs. Brown and Hill did not participate in the adjudication.

## *Appendix*

## FINDINGS OF FACT

### *Charge I ([A])*

(1) On June 8, 1980, [A], a New Jersey resident, was injured as a result of an accident which took place in [   ], New Jersey involving a vehicle driven by [Ms. L], owned by [Mrs. and Ms. L] and insured by [N] Insurance Company.

(2) In or about June 1980, Mr. [A] retained respondent, who is also an attorney licensed to practice law in New Jersey, to pursue all claims arising out of the accident.

(3) Mr. [A] executed a contingent fee agreement pursuant to which respondent would receive 33 and one-third percent of any funds recovered in connection with his claim plus reimbursement for any costs which had not been prepaid by Mr. [A].

(4) On or about March 29, 1982, respondent filed suit captioned *[A] v. [Ms. L] et al.,* at Civil Action no. [   ] in the Superior Court of New Jersey, Law Division, [   ] County, New Jersey.

(5) In March 1983, Dr. [M] advised respondent that she was addicted to the drugs prescribed to relieve her pain.

(6) On or about July 24, 1983, respondent communicated a settlement offer in the amount of $15,000 to Mr. [A], which he accepted.

(7) Some time prior to August 1, 1983, but after July 27, 1983, Mr. [A] executed a settlement release in favor of [N] Insurance and the [Ls].

(8) Respondent submitted the executed settlement release to [N] which issued its check no. 7-701380 dated August 1, 1983 in the amount of $15,000 payable to [A] and [respondent], attorney.

(9) Mr. [A] endorsed the check.

(10) Respondent advised Mr. [A] that he would receive his proceeds in a week or 10 days.

(11) On or about August 2, 1983, respondent deposited or caused to be deposited the [N] check into [E] National Bank account no. [ ], captioned: "[Respondent], P.A., General Account."

(12) Respondent knew the [A] settlement check had been deposited into the [E] account.

(13) At the time of settlement, Mr. [A] was entitled to receive a net share of $9,985.09 as his share of the settlement.

(14) On August 1, 1983, immediately prior to the deposit of Mr. [A's] funds into [E] Bank account no. [ ], the account was overdrawn.

(15) Between August 2, 1983 and September 1, 1983, respondent caused amounts more than service charges to be deposited into [E] account [ ].

(16) Between August 2, 1983 and September 1, 1983, checks were written for personal and professional purposes against the funds in [E] account [ ].

(17) At no time either prior to or after the settlement of his lawsuit did Mr. [A] authorize respondent to utilize any of his funds to defray respondent's personal or professional obligations.

(18) All checks drawn on [A] account no. [ ] which contained the name "[respondent]" as the signer were signed by respondent.

(19) When respondent signed the checks, she knew they were checks.

(20) As a result of respondent's disbursements, on September 1, 1983 the balance in respondent's [E] account no. [ ] had fallen to an overdrawn status.

(21) At the time respondent's account became overdrawn, she had not made payment to Mr. [A] of the net amount due and owing him from the settlement.

(22) In November 1983, respondent removed her law office from the [O] suite it had occupied since December 1980.

(23) Between August 2, 1983 and March 9, 1984, [A] made repeated unsuccessful attempts to locate respondent and obtain release of his share of the settlement proceeds. Those efforts included:

(a) A letter dated September 23, 1983 addressed to respondent at Suite [O];

(b) A letter dated November 3, 1983 addressed to respondent at Suite [O];

(c) A personal visit to respondent's office at Suite [O] on November 19, 1983.

(24) On February 27, 1984, the checks in settlement of the [C] matter were deposited into [F] Savings account [ ].

(25) Until the settlement check from the [C] matter was deposited on February 27, 1984, respondent was without sufficient funds to distribute funds to Mr. [A].

(26) By letter dated February 28, 1984 respondent notified Mr. [A] of purported "difficulties with our telephone system."

(27) The letter of February 28, 1984, addressed to Mr. [A] contains the address: [O].

(28) In or about November 1983, respondent closed all her accounts in [E] and opened [F] Savings and Loan checking account no. [ ].

(29) On March 9, 1984, respondent withdrew $10,015.05 from the [F] account and utilized those funds to purchase treasurer's check (cashier's check) no. 55035 in the amount of $10,015.05 which Mr. [A] picked up at respondent's office on that date.

(30) After the close of her [O] office suite, respondent continued to contact Mr. [A] using a letterhead containing the address of that suite.

*Charge II ([B])*

(31) On or about June 30, 1982, [B], a Pennsylvania resident, was injured in an accident which occurred in Pennsylvania involving a vehicle owned or operated by [G].

(32) Ms. [B] retained respondent on July 7, 1982 to pursue all claims arising out of the accident.

(33) Ms. [B] executed a contingent fee agreement whereby respondent would receive 40 percent of any funds she recovered in connection with the claim plus reimbursement for any costs.

(34) On February 22, 1983, respondent filed suit captioned *[B] v. [G] et al.,* Court of Common Pleas, [D] County, Pennsylvania, February term, 1983, no. [  ].

(35) In or about early December 1983, attorneys for the defendants made a settlement offer in the amount of $10,000 to respondent.

(36) Respondent advised Ms. [B] of the terms of settlement, which Ms. [B] agreed to accept.

(37) On or about December 21, 1983, respondent received a check from [G] dated December 21, 1983 in the amount of $10,000 in settlement of Ms. [B's] claim and payable to Ms. [B] and respondent.

(38) Pursuant to the fee agreement between respondent and Ms. [B], Ms. [B's] share of the settlement funds was approximately $6,000.

(39) On or about December 22, 1983, respondent and Ms. [B] signed the [G] check and respondent informed Ms. [B] that she would deposit it as soon as possible so that she could issue Ms. [B] a check for her share of the proceeds.

(40) Respondent advised Ms. [B] that it would take a few days for the check to clear and thereafter Ms. [B] would receive her share of the settlement proceeds.

(41) On December 22, 1983, respondent deposited or caused to be deposited the [G] check in the amount of $10,000 into [F] Savings and Loan account no. [   ], captioned: "[Respondent], P.A."

(42) On December 22, 1983, immediately prior to the deposit of Ms. [B's] funds into the [F] account, the account balance was $87.93.

(43) Between December 22, 1983 and March 9, 1984, respondent caused amounts more than service charges to be deposited into the [F] account.

(44) Between December 22, 1983 and March 9, 1984, checks were written on the [F] account to defray respondent's personal and professional obligations.

(45) All checks drawn on the [F] Savings account which contain the name "[respondent]" as the signer were, in fact, signed by respondent.

(46) At the time respondent signed the checks she was aware of what she was signing.

(47) Respondent did not have the authorization or consent of Ms. [B] to utilize her funds for personal or professional expenses.

(48) As a result of respondent's disbursements, on January 27, 1984 the balance in respondent's [F] account fell to an overdrawn status.

412

(49) By early January 1984, Ms. [B] had not received a distribution check from respondent.

(50) In early January 1984, Ms. [B] telephoned respondent's law office and inquired about receipt of the funds.

(51) On or about January 31, 1984, Ms. [B] had a conversation with respondent.

(52) During the course of the conversation of January 31, respondent promised to have a distribution sheet drawn up and forwarded to Ms. [B] at her parents' home in [ ], Pennsylvania.

(53) On February 8, 1984, Ms. [B] received a letter from respondent dated February 6, 1984.

(54) Enclosed with the letter was a distribution sheet calling for Ms. [B] to receive $5,964.09.

(55) The Pennsylvania address contained on the letter of February 6, 1983 was [O].

(56) In February 1984, respondent had no office at [O].

(57) After receiving the letter of February 6, 1984, Ms. [B] telephoned respondent's office to question the content of the distribution sheet.

(58) In particular, Ms. [B] contended that she should receive $6,000 plus interest from the time the settlement check was deposited.

(59) Respondent agreed to pay Ms. [B] the interest and advised her that another distribution sheet would be drawn up and returned to her.

(60) In a note dated February 13, 1984, Ms. [B] wrote to respondent authorizing her father, [ ], to act on her behalf by signing the distribution sheet and receiving the distribution check from the [G] settlement.

(61) On or about February 16, 1984, Ms. [B] received and executed a subsequent distribution sheet dated February 13, 1984.

(62) On the distribution sheet, Ms. [B] wrote: "Payment is to be made to me, [B], no later than Tuesday, February 21, 1984. Check issued is to be a cashier's check."

(63) Subsequently, Ms. [B] contacted respondent's office to arrange for her father to pick up the check on February 21 or 22.

(64) On the morning of February 21 at approximately 10 a.m., Ms. [B] received a telephone call from respondent's office and was advised the check would not be ready.

(65) On February 21, 1984, respondent did not have sufficient funds to pay Ms. [B] the amount due her.

(66) By letter dated February 22, 1984, Ms. [B] wrote to respondent demanding payment of the settlement proceeds by February 28, 1984 plus interest to that date.

(67) The letter of February 22, was sent by Ms. [B] by certified mail return receipt requested.

(68) The postal return receipt shows that the document was received in the office of respondent and signed for by [P], an employee of respondent, on February 23, 1984.

(69) On February 27, 1984, the checks in settlement of the [C] matter were deposited into [F] Savings account [    ].

(70) Until the settlement check from the [C] matter was deposited on February 27, 1984, respondent was without sufficient funds to distribute funds to Ms. [B].

(71) By letter dated March 5, 1984, [Q], Esq., wrote to respondent advising that:

(a) She represented Ms. [B];

(b) Ms. [B] was requesting payment of the proceeds of the settlement with interest to the date of payment;

(c) That payment be made by direct wire transfer to a specified account belonging to Ms. [Q's] law firm;

(d) That said payment should be made no later than the close of business on Thursday, March 8, 1984.

(72) By letter dated March 9, 1984, respondent forwarded to Ms. [Q] a cashier's check in the amount of $6,067.63, that figure constituting full distribution of the settlement proceeds plus interest to March 9, 1984.

(73) Until the settlement check from the [C] matter was deposited on February 27, 1984, respondent was without sufficient funds to distribute funds to Ms. [B].

## Charge III ([C])

(74) Prior to September 1982, [C], a resident of [R], Pennsylvania, was represented by [H], Esq. in state and federal claims against the Borough of [R] including: an employment discrimination suit filed in the United States District Court for the [    ] District of Pennsylvania and captioned *[C] v. Borough of [R] et al.,* Civil Action no. [    ], a workers' compensation claim and a civil service claim.

(75) In or about September 1982, Mr. [C] and Mr. [H] met with and retained respondent for the purpose of serving as lead counsel in Civil Action no. [ . ] and pursuing a workers' compensation claim.

(76) Mr. [C] and respondent entered into a contingent fee agreement whereby respondent would receive 40 percent of any funds recovered in connection with the claim plus reimbursement for any costs expended.

(77) In February 1984, respondent, acting with the authorization and consent of Mr. [C], reached a

settlement of all his outstanding claims against the defendants, including the state causes of action, for $80,000.

(78) During a telephone conversation, respondent discussed the details of the settlement with Mr. [C].

(79) On or about February 11, 1984, Mr. [C] executed a release.

(80) Prior to February 26, 1984, respondent received three checks in settlement of the matter totaling $80,000.

(81) On or about February 26, 1984, respondent and Mr. [C] endorsed checks and respondent informed Mr. [C] that she would deposit them as soon as possible.

(82) On February 27, 1984, the settlement checks were deposited into [F] account [   ].

(83) On February 26, 1984, immediately prior to the deposit of Mr. [C's] funds, [F] account [   ] was overdrawn.

(84) After the deposit of Mr. [C's] funds into the [F] account, respondent caused funds belonging to her in excess of the amounts of service charges to be deposited into the account.

(85) Between February 27, 1984 and March 31, 1984, respondent wrote checks against the funds contained in the account to defray her personal and professional obligations.

(86) All checks drawn on [F] Savings account [   ] which contain the name "[respondent]" as the signer were signed by respondent.

(87) At the time respondent signed the checks she was aware of what she was doing.

(88) On March 12, 1984, Mr. [C] went to respondent's office to obtain distribution of the settlement funds due him.

(89) No check was presented to Mr. [C] nor did he see any check.

(90) Subsequent to March 12, 1984, Mr. [C] had several conversations with respondent.

(91) During those conversations, respondent gave Mr. [C] numerous reasons for her failure to pay him the proceeds from the settlement, including:

(a) her illness;

(b) court attendance; and

(c) the bank manager was on vacation and only he could disburse the funds.

(92) On at least four occasions, respondent told Mr. [C] that she would send him his proceeds by Federal Express.

(93) Respondent advised Mr. [C] that she would personally bring him the money.

(94) Respondent did not send or deliver the funds to Mr. [C] as promised.

(95) Despite respondent's knowledge that money had been received from the settlement and were due and owing to Mr. [C], expenditures were made for respondent's personal and business expenses using funds belonging to Mr. [C].

(96) Respondent did not have the authorization or consent of Mr. [C] to use his funds for her personal and professional expenses.

(97) As a result of respondent's disbursements, on March 31, 1984, the balance in the [F] Savings account was $37,172.77, less than the amount owed to Mr. [C].

(98) By letter dated April, 13 1984 addressed by [H], Esq. to respondent, Mr. [H] advised respondent to pay the [Cs] their proceeds from the settlement.

(99) The letter of April 13, 1984 also advised respondent that he would "be happy to work . . . out" any problem between respondent and him with regard to the fee.

(100) Mr. [H] demanded respondent provide evidence that the proceeds were in her possession.

(101) Mr. [H] again wrote to respondent by letter dated May 1, 1984.

(102) In the May 1 letter, Mr. [H] advised respondent that he saw "no reason why you cannot disburse to [C] the monies you owe him from his settlement pending our discussions."

(103) The bank records in evidence reveal that as a direct result of using funds in the [F] account to pay personal and business obligations, she did not have sufficient funds to pay Mr. [C] his proceeds.

(104) On May 11, 1984, respondent closed [F] account no. [ ] into which she had deposited Mr. [C's] settlement funds. When the account was closed, the balance was $25,144.19.

(105) On May 11, 1984, respondent utilized the proceeds of the [F] account to obtain cashier's check no. 55960 issued by [F] Savings and Loan Association payable to respondent in the amount of $25,144.19.

(106) On May 11, 1984, respondent endorsed the [F] cashier's check and deposited it into [S] Bank account [ ] captioned "[Respondent], P.A., attorney escrow account."

(107) On or about June 21, 1984, respondent caused $20,000 to be deposited into the [S] account by wire transfer of her personal funds from [ ] Bank in [ ], Ohio, account no. [ ].

(108) On or about June 22, 1984, respondent closed or caused to be closed the [S] escrow account and obtained a check for the balance in the account in the amount of $38,344.39.

(109) The $38,344.39 check together with $1,203.52 in cash was used to obtain [S] Bank treasurer's check no. 145123 in the amount of $39,547.91 payable to [F] Savings Bank.

(110) On June 22, 1984, respondent used the [S] Bank treasurer's check and a check dated June 22, 1984 in the amount of $6,000 issued by [    ], Esq. to obtain treasurer's check no. 56509 in the amount of $45,547.91 payable to [Mr. and Mrs. C], h/w.

(111) On June 22, 1984, respondent did not possess sufficient funds to distribute the settlement proceeds to Mr. [C].

(112) During the period of time in which respondent was bound to keep the funds of her clients inviolate, the funds maintained in [F] Savings account [    ] were subjected to garnishment by Bank [    ].

## ORDER

And now, May 17, 1991, upon consideration of the report and recommendations of the Disciplinary Board dated April 15, 1991, it is hereby ordered that [respondent] be and she is suspended from the bar of this Commonwealth for a period of two years, and she shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.